1 **ERICK L. GUZMAN**
  California Bar No. 244391
2 **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
  225 Broadway, Suite 900
3 San Diego, CA 92101-5008
  Telephone: (619) 234-8467
4 Erick_Guzman@fd.org

5 Attorneys for Mr. Fernando Rodriguez

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                   **(HONORABLE LARRY A. BURNS)**

11 UNITED STATES OF AMERICA,          )    Case No. 08CR2268-LAB
                                      )
12              Plaintiff,            )    DATE: August 25, 2008
                                      )    TIME:  2:00 P.M.
13 v.                                 )
                                      )
14 FERNANDO RODRIGUEZ                 )    NOTICE OF MOTIONS AND MOTIONS TO:
                                      )
15              Defendant.            )    1)    SUPPRESS   EVIDENCE   DUE   TO
                                      )          FOURTH AMENDMENT VIOLATIONS
16                                    )    2)    SUPPRESS STATEMENTS/CONDUCT
                                      )          A VOLUNTARINESS HEARING;
17                                    )    3)    DISMISS  THE  INDICTMENT  FOR
                                      )          *APPRENDI* VIOLATION;
18                                    )    4)    PRESERVE EVIDENCE; AND
                                      )    5)    COMPEL DISCOVERY.
19                                    )
                                      )
20 _____  )

21

22 TO:    KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
          REBECCA KANTER, ASSISTANT UNITED STATES ATTORNEY:
23

24        PLEASE TAKE NOTICE that, on AUGUST 25, 2008 at 2:00 P.M.., or as soon thereafter as counsel

25 may be heard, defendant,  Fernando Rodriguez, by and through his attorneys, Erick L., Guzman, and Federal

26 Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

27                              **MOTIONS**

28        Defendant, Fernando Rodriguez, by and through his attorneys, Erick L. Guzman, and Federal

Defenders of San Diego, Inc., asks this Court, pursuant to the United States Constitution, the Federal Rules

of Criminal Procedure, and all other applicable statutes, case law, and local rules, for an order to:

     (1)      Suppress Evidence;

     (2)      Suppress Statements/Conduct a Voluntariness Hearing;

     (3)      Dismiss the Indictment Due to Violation of Apprendi and its Progeny;

     (4)      Preserve Evidence; and

     (5)      Compel Discovery.

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, the files and records in the above-captioned matter, and any and all other materials that may come to this Court's attention prior to or during the hearing of these motions.

Respectfully submitted,

DATED:  August 4, 2008          /s/ ERICK L. GUZMAN        
                                 **ERICK L. GUZMAN**
                                 Federal Defenders of San Diego, Inc.
                                 Attorneys for Mr. Rodriguez
                                 Erick_Guzman@fd.org

1 | **ERICK L. GUZMAN**
California Bar No. 244391
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | email: Erick_Guzman@fd.org

5 | Attorneys for Mr. Rodriguez

6 |

7 | UNITED STATES DISTRICT COURT

8 | SOUTHERN DISTRICT OF CALIFORNIA

9 | **(HONORABLE LARRY A. BURNS)**

10 | UNITED STATES OF AMERICA,               )     Case No. 08CR2268-LAB
                                          )
11 |             Plaintiff,                 )     DATE: August 28, 2008
                                          )     TIME:  2:00 P.M.
12 | v.                                      )
                                          )     STATEMENT OF FACTS AND
13 | FERNANDO RODRIGUEZ,                     )     MEMORANDUM OF POINTS AND
                                          )     AUTHORITIES IN SUPPORT OF
14 |             Defendant.                 )     DEFENDANT'S MOTIONS
                                          )
15 | _____   )     _____

16 |                                 **I.**

17 |                    **STATEMENT OF FACTS**[1]

18 |        On June 29, 2008,  Mr. Rodriguez drove up to the Highway 86 Border Patrol Checkpoint, with his

19 | valid and current I-551 (green card). <u>See</u> Report of Investigation at 2 (attached as Exhibit A).  A Border Patrol

20 | agent told Mr. Rodriguez that he matched the description of a person for whom they were waiting.    <u>See</u>

21 | Declaration of F. Rodriguez (attached as Exhibit B)[2].  Narcotics dog Hoby was directed to Mr. Rodriguez's

22 | vehicle and gave a positive alert. <u>See</u> Exhibit A at 2.  Mr. Rodriguez was directed and escorted to the inside

23 | of an office. Mr. Rodriguez did not feel free to leave the office. <u>See</u> Exhibit B.  At this point, Border Patrol

24 | Agents asked Mr. Rodriguez if they could search the vehicle, and according to the government, he consented.

25 | _____

26 |    [1]    This statement of facts is based primarily on discovery received from the government.  Obviously,
27 | it is not so based when it is attributed to Mr. Rodriguez's declaration.  Mr. Rodriguez does not concede the
veracity of these facts.

28 |    [2]    Mr. Rodriguez is on bond in Arizona and could not deliver the signed declaration in time for this
filing.  The signed original declaration is *en route* to San Diego and will be forwarded to the Court upon
receipt.

1 | See id. Marijuana was located in an auxiliary tank that was attached to the bed of the truck.

2 |      Border Patrol agents placed Mr. Rodriguez in a small room, with his back against the wall. See id.

3 | There were two agents present, and both agents were great in stature. See id. Border Patrol Agents told Mr.

4 | Rodriguez that they wanted him a few questions. Mr. Rodriguez was intimidated by the agents and felt some

5 | pressure to speak with them. See id. They told him that it would help Mr. Rodriguez if he told them what

6 | happened. See id. Mr. Rodriguez denied knowledge of the Marijuana.

7 |      On June 30, Agent Huxman requested the surveillance footage related to Mr. Rodriguez's arrest, and

8 | was told that he would not be able to receive it. See Exhibit DEA report at 7 (attached as Exhibit C). Mr.

9 | Rodriguez then inquired into the status of this footage, and was informed by the United States Attorney's

10 | office that no such footage existed due to technical problems.

11 | **II.**

12 | **MOTION TO SUPPRESS EVIDENCE**

13 |      Mr. Rodriguez moves the Court to suppress evidence, and/or dismiss the indictment, based on

14 | violation of Mr. Rodriguez's Fourth Amendment rights.

15 | **A.    Background**

16 |      As mentioned above, Mr. Rodriguez has not received the video of the events surrounding his arrest.

17 | As mentioned above, Mr. Rodriguez has been informed that no such tape exists. Accordingly, these motions

18 | are based on defense counsel's information.

19 | **B.    Checkpoint Related Issues**

20 |      Based on what defense counsel knows at this time, Mr. Rodriguez raises four general issues (which

21 | contain sub-issues) with respect to the checkpoint search of his car: (1) the "immigration" checkpoint is

22 | impermissibly being used for general law enforcement purposes (*i.e.*, to search for drugs), and was so used

23 | in this case; (2) Mr. Rodriguez was impermissibly referred to secondary[3] inspection, and the wait in secondary

24 | inspection was improper; (3) any consent to search was invalid; and (4) without establishing that the narcotic

25 | detector dog is reliable, the government cannot rely on its alleged alert to provide probable cause for the

26 |

27 | ————————————

28 |    [3]  It is defense counsel's understanding that "secondary" at the Highway 86 checkpoint is an office, as opposed to the "secondary" areas at the ports of entry.

1  search, and without an alert there was no probable cause.  Accordingly, the Court should suppress the fruits[4]

2  of any violations it finds.

3      **1.    The Immigration Checkpoint Is Impermissibly Being Used For General Law Enforcement Purposes (*i.e.*, To Search For Drugs), And Was So Used In This Case**

4

5      Defense counsel's experience suggests that the government is using what it calls "immigration"

6  checkpoints for general law enforcement purposes; *i.e.*, to look for drugs.  That impression is buttressed in

7  this case by a few things.  First, following the discovery of the marijuana primary inspector, Agent Vega,

8  stated that the following regarding the events at the primary inspection area:

9      I was working pre-primary inspection with my service canine Hoby [REDACTED] when white [*sic*] Ford F-250 pickup truck approached our position.  Agent Marino was working
10    I primary inspection and identified himself as a Border Patrol Agent and asked the driver of what country he was a citizen.  The driver, later identified as Rodriguez-Mendoza, Fernando said he was a citizen of Mexico and presented a valid I-551 card.  While Agent
11    Marino  was interviewing Rodriguez, I conducted a canine sniff of the vehicle.  Canine Hoby alerted to the truck bed which contained a large storage tool box and an auxiliary fuel
12    tank.

13  Exhibit C at 2.  This suggests Agent Ortiz referred the truck to secondary for a drug search, not for

14  immigration purposes.  Also, the Border Patrol agent's statement that they were waiting for Mr. Rodriguez

15  buttresses this conclusion.  <u>See</u> Exhibit B.  This, is consistent with defense counsel's experience with respect

16  to the government's use of immigration checkpoints.  In fact, such improper use of an immigration checkpoint

17  was established during a hearing in Judge Moskowitz's courtroom in <u>United States v. Rummerfield</u>, S.D. Cal.

18  Case No. 02CR2727.

19      These facts suggest a programmatic Fourth Amendment violation, as well as an individual violation

20  of Mr. Rodriguez's Fourth Amendment rights.  <u>See</u> <u>Indianapolis v. Edmond</u>, 531 U.S. 32, 47-48 (2000);

21  <u>Whren</u>, 517 U.S. 806, 811 (1996); <u>Wilson</u>, 7 F.3d at 828 (indicating that investigating a vehicle for drugs at

22  a fixed checkpoint under the pretext of an immigration inspection violates the Fourth Amendment).  As Judge

23  Kozinski stated in a concurrence in <u>United States v. Soyland</u>, "[t]here's reason to suspect the agents working

24  these checkpoints are looking for more than illegal aliens.  If this is true, it subverts the rationale of <u>Martinez-</u>

25  <u>Fuerte</u> and turns a legitimate administrative search into a massive violation of the Fourth Amendment."  3

26  F.3d at 1316.

27  _____

28      [4]    Mr. Rodriguez  will address the fruits analysis if and when the Court finds a constitutional violation.

1    Accordingly, Mr. Rodriguez requests that the government be required to produce discovery on this

2    issue, including any materials (written, recorded, videotaped, *etc.*) pertaining to the Border Patrol policy,

3    procedure, and practice with respect to searching for drugs or other contraband at the Highway 86 checkpoint,

4    or immigration checkpoints generally.  Mr. Rodriguez also requests that the government be required to

5    provide data regarding the number of searches and arrests at the Highway 86 checkpoint over the past two

6    years, the reasons for the searches (if known), and the charges leveled upon arrest, if any.  Mr. Rodriguez also

7    requests that the Court order the government to produce the names of those responsible for training and

8    implementing Border Patrol policy regarding searching for contraband at the Highway 86 checkpoint, so such

9    people may be subpoenaed to testify before this Court.  Mr. Rodriguez also requests that the Court order

10   discovery of any materials tending to show that on June 29, 2008, the officers at the checkpoint were looking

11   to search F-250's, or Mr. Rodriguez's car, or people named Fernando Rodriguez-Mendoza, including that the

12   Court order production of the checkpoint video for the eight hours preceding Mr. Rodriguez's arrival there,

13   and any information or materials that show there was a look-out for a vehicle similar to Mr. Rodriguez's.

14   Finally, Mr. Rodriguez requests that the Court order production of any materials or information that show the

15   purpose for referring Mr. Rodriguez's car to secondary was to search for drugs, or that the referral was for

16   anything other than immigration purposes.

17   **2.    Mr. Rodriguez Was Impermissibly Referred To Secondary Inspection, And The Wait In Secondary Inspection Was Unreasonable**

18
19       Mr. Rodriguez was impermissibly referred to secondary inspection, and the scope of his detention

20   there, before any search was conducted, or consent was obtained, violated the Fourth Amendment.

21       In United States v. Martinez-Fuerte, 428 U.S. 543 (1976), the Supreme Court indicated that while

22   immigration checkpoints are permissible, they must be "limited to the types of stops described in [its] opinion.

23   Any further detention . . . must be based on consent or probable cause." 428 U.S. at 567.  Regarding the scope

24   of the stop, Martinez-Fuerte only permits agents to request "a response to a brief question or two and possibly

25   the production of a document evidencing a right to be in the United States," and conduct a "visible inspection

26   of the vehicle limited to what can be seen without a search." Martinez-Fuerte, 428 U.S. at 558 (quotation

27   omitted); see also Soyland, 3 F.3d at 1318 (noting that a Fourth Amendment violation occurs "when a Border

28   Patrol agent conducts a separate investigation after he's established there are no immigration law violations")

(Kozinski, J., concurring).

1    Here, Agent Marino was learned that Mr. Rodriguez was a Legal Permanent Resident and was

2 presented with a valid green card. Agent Marino also had a chance to look inside the vehicle. Thus, any

3 further detention was required to be supported by "consent or probable cause." The referral to secondary was

4 not supported by either. Mr. Rodriguez recognizes that the government is claiming that Mr. Rodriguez

5 consented to the search immediately. However, Mr. Rodriguez has set out a different factual scenario with

6 the request for consent not occurring until much later. See Exhibit B. Notwithstanding, even under Agent

7 Vega's version of the events, his request for consents occurs impermissibly late.

8       **3.       Any Consent To Search Was Invalid**

9    The search of Mr. Rodriguez's vehicle also offended the Fourth Amendment because it was not

10 supported by probable cause.

11    The government likely will assert that the search of Mr. Rodriguez's car was permissible because he

12 consented to such a search. As an initial matter, because the scope of the detention exceeded that permissible

13 under Martinez-Fuerte, any alleged consent to search the car was invalid because it is tainted by the illegal

14 detention. See Florida v. Royer, 460 U.S. 491, 502-504 (1983) (holding that because "the detention [in that

15 case] was a more serious intrusion on [the defendant's] personal liberty than is allowable on a mere suspicion

16 of criminal activity," the defendant's consent to search his luggage "was tainted by the illegality and was

17 ineffective to justify the search").

18    Moreover, any consent cannot be said to have been voluntary because an encounter cannot be said

19 to be consensual if a "reasonable person would have believed that he was not free to leave." California v.

20 Hodari D., 499 U.S. 621, 627-28 (1991). Mr. Rodriguez was ordered to secondary by an armed, uniformed

21 officer, and was made to wait there while other armed, uniformed officers searched other cars. In addition,

22 his identification was taken from him in the primary area. Accordingly, he would not have felt free to leave.

23    And the testimony of other Border Patrol agents in similar circumstances indicates Mr. Rodriguez,

24 in fact, was not free to leave. In testimony before Judge Lorenz, Border Patrol Agent Ernesto Arellano

25 testified about searches at the San Clemente checkpoint, and stated that "we require consent from all owners

26 of vehicles or people in the vehicle, to look in the trunk." See Portion of Transcript at 6 (attached at Exhibit

27 D). Similarly, in testimony by Border Patrol agent Mullens before Judge Miller, he stated the practice at the

28 Interstate 8 checkpoint is that when consent to open the trunk is requested, the driver is not free to leave, and

"[i]f a vehicle is placed in secondary, it is not free to leave until it is released." See Portion of Transcript at 29 (attached at Exhibit E). This reinforces what a reasonable person would believe: he can't just leave.

### 4. There Was No Probable Cause For The Search, Absent A Showing The Narcotic Detector Dog Was Reliable

Finally, presumably the government will rely on the alleged dog alert to support probable cause for the search. Mr. Rodriguez seeks to challenge the reliability of the dog (based on defense counsel's broad experience indicating that such dogs are improperly trained and maintained), and thus requests discovery consistent with United States v. Cedano-Arellano, 332 F.3d 568, 571 (9th Cir. 2003). A copy of the dog expert's declaration supporting the discovery request in Cedano-Arellano is attached as Exhibit F, to make clear what Mr. Rodriguez is requesting, the basis therefor, and what was ruled on in that case.

### III.

### MOTION TO SUPPRESS STATEMENTS

If the government seeks to introduce statements attributable to Mr. Rodriguez, the government must first prove that they comply with Miranda and were voluntary.

### A. Any Waiver by Mr. Rodriguez was not Knowing, Intelligent, and Voluntary.

In order for any statements made by Mr. Rodriguez to be admissible against him, the government must demonstrate that they were obtained in compliance with the Miranda decision.

The government must establish that Mr. Rodriguez's waiver of his Miranda rights was voluntary, knowing, and intelligent. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973). When interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination. Miranda, 384 U.S. at 475. The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great. United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case. Edwards v. Arizona, 451 U.S. 477 (1981); United States v. Garibay, 143 F.3d 534 (9th Cir. 1998). The Ninth Circuit has held that determination of the validity of a Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and intelligent. Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990). The second prong requires an inquiry into

1   whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the

2   consequences of the decision to abandon it." Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564, 573

3   (1987)).    Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

4   comprehension" before a court may conclude that Miranda rights have been legitimately waived. Id. (quoting

5   Colorado v. Spring, 479 U.S. at 573).    Unless and until Miranda warnings and a knowing and intelligent

6   waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

7   against the defendant. Miranda, 384 U.S. at 479. The government in this case must prove that Mr. Rodriguez

8   waived his rights intelligently and voluntarily.    Mr. Rodriguez disputes any allegation any waiver was

9   knowing, intelligent, and voluntarily.

10       Mr. Rodriguez does not speak English.    He was confronted by large, armed agents--at least some

11   of whom did not speak Spanish--and forced into a small room, with his back against the wall. See Exhibit B.

12   This situation was overwhelming and nerve-wracking.    Accordingly, any waiver was not knowing, nor

13   intelligent, voluntary,  and must be suppressed.

14   **B.      Mr. Rodriguez's Statements Must Be Voluntary.**

15       Even if this Court determines that Mr. Rodriguez validly waived his Miranda rights, it must still

16   make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is required

17   to determine, whether any statements made by Mr. Rodriguez are voluntary.  In addition, section 3501(b)

18   requires this Court to consider various enumerated factors, including whether Mr. Rodriguez understood the

19   nature of the charges against him and whether he understood his rights.  Without such evidence, this Court

20   cannot adequately consider these statutorily mandated factors.  Also, the factors listed above to support a lack

21   of a intelligent waiver also support finding a lack of voluntariness.

22       Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual

23   determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings. See United States

24   v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important

25   as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be

26   supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's

27   responsive pleading.

28

1  **C.      The Statements Must be Suppressed for Violation of the Vienna Convention.**[5]

2          Article 36 of the Vienna Convention on Consular Relations, April 24, 1963 U.S.T. 77, provides that

3  law enforcement officials "shall inform...without delay" arrested foreign nationals of their right to notification

4  of their consulates.  The Ninth Circuit has held that this treaty creates enforceable individual rights.  Lombera-

5  Camorlinga, 170 F.3d at 1244, (reversed on other grounds, Lombera-Camolinga, 206 F.3d 882, 885 (9th cir.

6  2000).

7          In order for law enforcement to comply with the "without delay" requirement of Article 36, they must

8  inform a foreign national of their consulate right before any interrogation takes place.  This proposition is

9  supported by the further language that: "The rights referred to in paragraph 1 of this Article shall be exercised

10 in conformity with the laws and regulations of the receiving state."  The most analogous and relevant laws of

11 the this country (the Receiving state) would be the law regarding advising of rights before questioning by law

12 enforcement.  See Miranda v. Arizona, 384 U.S. 476 (1966).  That body of law requires that people be

13 informed of their rights prior to questioning.  Therefore, to be in conformity with U.S. law--as required by

14 Article 36--the consulate right notification must precede custodial interrogation.

15         The en banc opinion of Lombera-Camorlinga states the exclusionary rule was not the necessary

16 remedy for violations of this treaty, in part because the State Department "indicate[d] that it has historically

17 enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign

18 government and working with domestic law enforcement to prevent future violations when necessary." It

19 appears now, seven years later, that the State Department's efforts are insufficient to curtail blatant violations

20 of the Vienna Convention.   In this case, Border Patrol agents claim to have read Mr. Rodriguez his Miranda

21 rights, so it is clear that they believed him to be in custody.  See Exhibit C at 5.

22         The Border Patrol agents in this case violated the Vienna Convention, and therefore, the any

23 statements that occurred after this violation should be suppressed.

24

25

26

27

---

28     [5]Mr. Rodriguez recognizes that the en banc decision of Lombera-Camorlinga, 206 F.3d 882 is arguably
       to the contrary.  Mr. Rodriguez raises the issue to preserve his appellate record.

**IV.**

## THE COURT SHOULD DISMISS INDICTMENT BASED ON
## APPRENDI V. NEW JERSEY AND ITS PROGENY

Mr. Rodriguez moves to dismiss based on the unconstitutionality of 21 U.S.C. §§ 841 and 960.  It is clear that Congress intended drug type and quantity to be sentencing factors to be decided by a judge by a preponderance of the evidence.  That regime is contrary to the holding of Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny, and thus the statute is unconstitutional, and the indictment should be dismissed.

Moreover, the "fix" for the statute leads to the conclusion that the government should have to prove knowledge of drug type and quantity, something the government disagrees with, and thus likely something on which the government misinstructed the grand jury.  Dismissal may be appropriate on this basis, and thus the Court should order production of the grand jury transcript.  See Fed. R. Crim. P. 6(e)(3)(E)(ii).

**V.**

## MOTION TO PRESERVE AND INSPECT EVIDENCE

Mr. Rodriguez renews the request for preservation of evidence that was originally made before Judge Lewis in El Centro California.  See Clerk's Docket Sheet at 8.  This includes any evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government (or its private contractors) in this case.  See United States v. Riley, 189 F.3d 802, 806-08 (9th Cir.1999).  This request includes, but is not limited to: (1) the defendant's personal effects; (2) the vehicle seized in the event; (3) any videotapes capturing Mr. Rodriguez[6] or any third party in relation to this case (4) any recorded communications made by government or non-government officials related to the above captioned case, e.g., 911 or dispatch tapes; and, (5) any other evidence seized from the defendant or any third party in relation to this case.  This request also includes any material or percipient witnesses who might be deported or otherwise likely to become unavailable.  Mr. Rodriguez requests that government counsel be ordered to notify the agencies and private contractors with custody of such evidence be informed of the Court's preservation order.  Further, Mr. Rodriguez requests an order granting defense counsel and/or their investigators access to the evidence for the purposes of investigation, including inspection, and

---

[6]    Mr. Rodriguez recognizes that the government claims that no such footage exists.  He makes this request in the event that such footage is discovered later.

1  photographing.  FED. R. CRIM. P. 16(a)(1)(C).  A proposed order is attached for the convenience of the

2  Court.  Mr. Rodriguez also requests an order form this Court allowing Federal Defenders of San Diego

3  access to re-weigh the alleged Marijuana.  Again, a proposed order is attached.

4      Mr. Rodriguez also requests preservation of any radio relays involving Border Patrol Agents, or

5  other law enforcement agencies, regarding this arrest.  He further requests preservation of any video

6  records or written memorializations of his post arrest statements from June 29, 2008.

7      Mr. Rodriguez requests that the above materials be preserved throughout the pendency of the

8  case, including any appeals.

9                                                                **VI.**

10                                        **MOTION TO COMPEL DISCOVERY**

11

12      At this time, Mr. Rodriguez has received limited discovery.  Mr. Rodriguez hereby  moves for
   the production of all additional discoverable material.

13

14      At this time Mr. Rodriguez has received only **thirty-four pages** of discovery and requests the
   following additional discovery materials.  This  request is not limited to those items that the prosecutor

15

16  knows of.  It includes all discovery listed below that is in the custody, control, care, or knowledge of any
   "closely related investigative [or other] agencies."  See United States v. Bryan, 868 F.2d 1032 (9th Cir.

17

18  1989); United States v. Jernigan, 492 F.3d 1050 (9th Cir. 2007) (en banc).  Also, Mr. Rodriguez renews
   his request for any recording of his post arrest statement, any written memorialization of his statement, or

19

20  any notes written by the agents during his interrogation; intelligible copies of the pages 16, 17 of 27-31 of
   discovery; the request made above at section II.B.1; the reports prepared in connection with the

21

22  malfunctioning of the video equipment of the Highway 86 checkpoint that was supposed to capture Mr.
   Rodriguez at pre-primary, primary and his interrogation; and reports dealing with the repair of that

23

24  equipment.  Also, Mr. Rodriguez requests:

25      (1) Brady Material.  The defendant requests all documents, statements, agents' reports, and
   tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

26

27  government's case.  Under Brady, impeachment as well as exculpatory evidence falls within the definition
   of evidence favorable to the accused.  United States v. Bagley, 473 U.S. 667 (1985); United States v.

28

   Agurs, 427 U.S. 97 (1976).

1    (2) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar

2  acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions which would be

3  used to impeach as noted in Fed. R. Crim. P. 609.  In addition, under Fed. R. Evid. 404(b), "upon request

4  of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general

5  nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The

6  defendant requests such notice two weeks before trial in order to give the defense time adequately to

7  investigate and prepare for trial.

8    (3) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any

9  search.  Fed. R. Crim. P. 16(a)(1)(E).  She wishes to inspect the evidence before trial.  **Specifically, the**

10  **defense requests the opportunity to inspect the 1993 Honda Odyssey seized in this case.  In addition,**

11  **the defense wishes to inspect the 50.34 kilograms of marijuana allegedly found in the seized vehicle.**

12  <u>See</u> Section III, below.  **A proposed preservation order has been electronically mailed to the Court**

13  **for the Court's signature.**

14    (4) <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the preservation

15  of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or

16  care of the government and which relates to the arrest or the events leading to the arrest in this case.  This

17  request includes, but is not limited to, any samples of narcotics used to run any scientific tests, any

18  narcotics, the results of any fingerprint analysis, the vehicle which the defendant drove, the defendant's

19  personal effects, and any evidence seized from the defendant or any third party.

20    In addition, Mr. Rodriguez specifically  requests that the Assistant United States Attorney

21  assigned to this case oversee a review of all personnel files of each agent involved in the present case for

22  impeachment material.  <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995); <u>United States v. Henthorn</u>, 931 F.2d 29

23  (9th Cir. 1991); <u>but see</u> <u>United States v. Herring</u>, 83 F.3d 1120 (9th Cir. 1996).

24    (5) <u>Tangible Objects</u>.  The defendant seeks to inspect and copy as well as test, if necessary, all

25  other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics,

26  fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended

27  for use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim.

28  P. 16(a)(1)(E).  **A proposed preservation order has been electronically mailed to the Court for the**

1 **Court's signature.**

2     (6) <u>Expert Witnesses</u>. The defendant requests the name, qualifications, and a written summary

3 of the testimony of any person that the government intends to call as an expert witness during its case in

4 chief. Fed. R. Crim. P. 16(a)(1)(G).

5     (7) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any prospective

6 government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort her

7 testimony.

8     (8) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective

9 government witness has engaged in any criminal act, whether or not resulting in a conviction, and whether

10 any witness has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady</u>

11 <u>v. Maryland</u>.

12     (9) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defendant requests

13 any evidence that any prospective witness is under investigation by federal, state or local authorities for

14 any criminal conduct.

15     (10) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.

16 The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to

17 show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is

18 impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has

19 ever been an alcoholic.

20     (11) <u>Witness Addresses</u>. The defendant requests the name and last known address of each

21 prospective government witness. The defendant also requests the name and last known address of every

22 witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will

23 <u>not</u> be called as a government witness.

24     (12) <u>Name of Witnesses Favorable to the Defendant</u>. The defendant requests the name of any

25 witness who made an arguably favorable statement concerning the defendant.

26     (13) <u>Statements Relevant to the Defense</u>. The defendant requests disclosure of any statement

27 relevant to any possible defense or contention that she might assert.

28     (14) <u>Jencks Act Material</u>. The defendant requests production in advance of trial of all material,

1  including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C.

2  § 3500.  Advance production will avoid the possibility of delay at the request of defendant to investigate

3  the Jencks material.

4          (15)  Giglio Information.  Under Giglio v. United States, 405 U.S. 150 (1972), the defendant

5  requests all statements and/or promises, express or implied, made to any government witnesses, in

6  exchange for their testimony in this case, and all other information which could arguably be used for the

7  impeachment of any government witnesses.

8          (16)  Scientific and Other Information.  To the extent not already provided, the defendant

9  requests  the results of any scientific or other tests or examinations, including testing done on the alleged

10  marijuana.  See Rule 16(a)(1)(F).

11          (17)  Informants and Cooperating Witnesses.  The defense requests disclosure of the name(s),

12  address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and

13  in particular, disclosure of any informant who was a percipient witness in this case or otherwise

14  participated in the charged crime.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The government

15  must disclose any information derived from informants which exculpates or tends to exculpate the

16  defendant.  Brady v. Maryland, 373 U.S. 83 (1963).  The government must disclose any information

17  indicating bias on the part of any informant or cooperating witness.  Id.

18          (18)  Personnel Records of Government Officers Involved in the Arrest.  Mr. Rodriguez

19  specifically requests all citizen complaints and other related internal affairs documents involving any of

20  the Customs officers or other law enforcement officers who were involved in the investigation, arrest and

21  interrogation of her, pursuant to Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the

22  sensitive nature of these documents, defense counsel will not be able to procure them from any other

23  source.

24          (19) Government Examination of Law Enforcement Personnel Files.  The defendant requests that

25  the Government examine the personnel files and any other files within its custody, care or control, or

26  which could be obtained by the government, for all testifying witnesses, including testifying officers.  She

27  requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or

28  other like dishonesty, or any other material relevant to impeachment, or any information that is

1    exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  Only the

2    prosecutor has the legal knowledge and ethical obligations to fully comply with this request.

3           (20)  <u>Training of Border Patrol and DEA Agents.</u>  The defendant requests copies of any and all

4    written policies and/or training manuals issued by the Department of Homeland Security to their

5    employees regarding:  (1) the handling of vehicles suspected to be transporting illegal contraband near or

6    to the border; (2) the detention of individuals within those vehicles suspected of carrying contraband; and

7    (3) the search of those vehicles and the occupants of those vehicles.

8           (21)  <u>Residual Request</u>.  Mr. Rodriguez intends by this discovery motion to invoke her rights to

9    discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

10   and laws of the United States.  Mr. Rodriguez requests that the government provide her with the above

11   requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

12

## VII.

13

## CONCLUSION

14

15           For the reasons stated above, Mr. Rodriguez moves this Court to grant his motions.

16                                                        Respectfully submitted,

17   DATED:            August 4, 2008                      /s/ Erick L. Guzman /s/

18                                                        **ERICK L. GUZMAN**
                                                         Federal Defenders of San Diego, Inc.
19                                                        Attorneys for Mr. Rodriguez

20

21

22

23

24

25

26

27

28

14                                                       08CR2268-LAB

1   **ERICK L. GUZMAN**
    California State Bar No. 244391
2   **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
    225 Broadway, Suite 900
3   San Diego, CA 92101-5008
    (619) 234-8467/Fax: (619) 687-2666
4   E-Mail: erick_guzman@fd.org

5   Attorneys for Fernando Rodriguez

6

7

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10               **(HONORABLE LARRY A. BURNS)**

11   UNITED STATES OF AMERICA,      )     Case No. 08CR2268-LAB
                              )
12             Plaintiff,            )
                              )
13   v.                      )     **CERTIFICATE OF SERVICE**
                              )
14   FERNANDO RODRIGUEZ,         )
                              )
15            Defendant.        )
    _____ )
16

17         Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his

18   information and belief, and that a copy of the foregoing document has been served this day upon:

19                             Rebecca Kanter
       Rebecca.Kanter@usdoj.gov,glory.rascon@usdoj.gov,efile.dkt.gc1@usdoj.gov
20

21                               Respectfully submitted,

22

23   DATED:        August 4, 2008            /s/ Erick L. Guzman
                                   **ERICK L. GUZMAN**
24                                    Federal Defenders of San Diego, Inc.
                                   Attorneys for Fernando Rodriguez
25

26

27

28

## UNITED STATES v. FERNANDO RODRIGUEZ
### U.S.D.C. Case No. 08ᴄʀ2268-LAB

### INDEX OF EXHIBITS

Exhibit A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 2
Exhibit B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 6
Exhibit C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 9
Exhibit D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 18
Exhibit E. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 25
Exhibit F. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 35

# EXHIBIT A

1

# BORDER PATROL
## REPORT OF APPREHENSION OR SEIZURE

FDIN: ▮▮▮▮▮▮▮▮

| Office or Agency | File Case No: ▮▮▮▮▮▮▮▮ |
|---|---|
| **OFFICER IN CHARGE**<br>**DRUG ENFORCEMENT ADMINISTRATION**<br>**2425 LA BRUCHERIE RD**<br>**IMPERIAL, CA 92251** | Sector: ▮▮▮▮▮▮▮▮<br><br>Date 06/29/2008 |

Patrol Agents  RAYMOND VEGA<br>HOBY ▮▮▮▮▮▮▮      of the INDIO     INDIO     station

☐ assisted the _____

(Agency)             (City and State)

in the apprehension and seizure of the following.

☒ apprehended/interviewed:

| Name (Surname in CAPS)    First    Middle | Date and Place of Birth |
|---|---|
| RODRIGUEZ-Mendoza, Fernando | 04/02/1976<br>COLIMA, COLIMA, MEXICO |
| Address of person apprehended/interviewed<br>3505 W 3RD PL.<br><br>YUMA, AZ 85364 | Nationality<br>MEXICO |

☒ and seized/recovered:      **VESSEL, VEHICLE OR AIRCRAFT**

| Description (Year, Make Model, Color) | Motor or Serial No | Registry or License No. | Value (Est.) |
|---|---|---|---|
| 2001 FORD F250 White | 3FTNF20L11MA63827 | AZ/AAV7486 | $7,800.00 |

### CONTRABAND, MERCHANDISE OR OTHER

| Quantity | Description | Value (Est.) |
|---|---|---|
| 198.100 Lbs | MARIJUANA - 9 CELLOPHANE WRAPPED BUNDLES CONTAINING A GREEN LEAFY SUBSTANCE | $150,480.00 |

| Place of Apprehension or Seizure<br>Highway 86 Checkpoint near Westmorland,<br>California | Date and Hour<br>06/29/2008 1430 | Offense<br>Title 21 Transportation Of A Controlled<br>Substance |
|---|---|---|

**NARRATIVE:** (Include Circumstances of apprehension and seizure and facts to which apprehending officers can testify.)

... (CONTINUED ON I-831)          RAYMOND VEGA

Signature of Reporting Officer

Received above persons and items:

_____ SA

Signature and Title

DRUG ENFORCEMENT ADMINISTRATION

Office or Agency

Details regarding "HOLD" placed

06/29/2008

Date

Form I-44 (Rev. 08/01/07)        UNITED STATES DEPARTMENT OF HOMELAND SECURITY

2   13

U.S. Department of Homeland Security

Continuation Page for Form I-44

| Alien's Name | File Number A057 679 912 | Date |
|---|---|---|
| RODRIGUEZ-Mendoza, Fernando | Event No: | 06/29/2008 |

**Narrative Title: Report of Apprehension or Seizure**
------------------------------------------------

On June 29, 2008, I Agent Vega was assigned to the operational US Border Patrol Highway 86 Checkpoint. At approximately 1430 hours, I was working pre-primary inspection with my service canine Hoby when white Ford F-250 pickup truck approached our position. Agent Marino was working primary inspection and identified himself as a Border Patrol Agent and asked the driver of what country he was a citizen. The driver, later identified as RODRIGUEZ-Mendoza, Fernando said he was a citizen of Mexico and presented a valid I-551 card. While Agent Marino was interviewing RODRIGUEZ, I conducted a canine sniff of the vehicle. Canine Hoby alerted to the truck bed which contained a large storage tool box and an auxiliary fuel tank. I verbally requested Agent Marino to send the vehicle to secondary inspection. At the completion of his interview, Agent Marino directed the vehicle to secondary inspection.

In secondary inspection, I approached the vehicle and identified myself as a US Border Patrol Agent. I asked RODRIGUEZ if I could search the vehicle and he said "yes". I asked RODRIGUEZ to turn off the engine and exit the vehicle. I conducted another canine sniff of the vehicle and Canine Hoby alerted to the auxiliary fuel tank mounted in the bed of the truck. I returned Canine Hoby to my service provided vehicle and conducted a search of the area in which he alerted. Agent Madrid assisted me in searching the fuel tank which appeared to contain diesel fuel. An inspection of the fuel tank revealed that there were two bolts that mounted the tank to the truck bed and both appeared to have been recently tampered with. Agent Madrid searched the inside of the tank with a fiber optic scope and noticed that the tank had been modified and contained a separate compartment. Agent Madrid and I turned the tank onto its side which revealed several large cellophane wrapped bundles. A field-test utilizing a Narcotic Identification Kit (NIK) was conducted on the bundles c containing a green leafy substance. The green leafy substance tested positive for the properties of marijuana. RODRIGUEZ was escorted into the checkpoint for further investigation.

Nine bundles were removed from the fuel tank with a total weight of 188.1 pounds and a value of $150,480. RODRIGUEZ, the contraband and vehicle were turned over to Agent Huxman of the Drug Enforcement Administration.

A 72 hour lane check revealed multiple crossings through the San Luis Port of Entry. Negative secondary.

Canine Hoby and I are a certified US Border Patrol detection team. We are certified in the detection of concealed humans and the odors of marijuana, cocaine, heroin, methamphetamines and their derivatives.

AGENT MARINO ADDENDUM

On June 29, 2008, I, Border Patrol Agent Marino, was assigned to the Highway 86 United States Border Patrol Immigration Checkpoint. At approximately 2:30 PM, I was working primary duties. A white Ford F-250 pickup approached my location.

I approached the driver, later identified as RODRIGUEZ-Mendoza, Fernando, and I identified myself as a United States Border Patrol Agent. I asked RODRIGUEZ his citizenship and he stated that he was a legally admitted permanent resident. I asked to see his resident card and noticed RODRIGUEZ'S hands were shaking as he handed me his card. Border Patrol Agent Vega informed me that his K-9 Hoby had an alert on the vehicle. At this time I referred the ... (CONTINUED ON NEXT PAGE)

| Signature | Title |
|---|---|
| RAYMOND VEGA | BORDER PATROL AGENT |

2 of 3 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

3    14

U.S. Department of Homeland Security                    Continuation Page for Form ____ I44 ____

| Alien's Name | File Number | Date |
|---|---|---|
| RODRIGUEZ-Mendoza, Fernando | A057 679 912 | 06/29/2008 |
| | Event No: | |

vehicle over to secondary inspection for further investigation.

| Signature | Title |
|---|---|
| RAYMOND VEGA | BORDER PATROL AGENT |

____3____ of ____3____ Pages

Form I 831 Continuation Page (Rev. 08/01·07)

4

15.



# EXHIBIT B

1  ERICK L. GUZMAN
   California State Bar No. 244391
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California 92101-5030
   Telephone: (619) 234-8467
4  Email: erick_guzman@fd.org

5

   Attorneys for Mr. Rodriguez
6

7

8
                    UNITED STATES DISTRICT COURT
9
                   SOUTHERN DISTRICT OF CALIFORNIA
10
                     (HONORABLE LARRY A. BURNS)
11

12
   UNITED STATES OF AMERICA,        )    CASE NO. 08CR2268-LAB
13                                   )
           Plaintiff,                )
14                                   )    DECLARATION OF FERNANDO
   v.                                )    RODRIGUEZ
15                                   )
   FERNANDO RODRIGUEZ,               )
16                                   )
           Defendant.               )
17  _____)

18

19        I, FERNANDO RODRIGUEZ, state as follows, under penalty of perjury:

20        1. I drove to the Highway 86 checkpoint on July 29, 2008.

21        2. When the agent approached me, he stated that I matched the characteristics of someone they were

22  waiting for.

23        3. Border Patrol agents took me inside of an office at the checkpoint. I did not feel free to leave this

24  office. At this point, the agents asked me if they could search my truck.

25        4. Border Patrol agents placed me inside of a small room, with my back against the wall. There were

26  two agents, and both were tall.

27

28

                                                                                08CR2268-LAB

5. I felt very nervous and pressured.  The agents told me that they would help me if I spoke with them.

I swear that to the best of my knowledge and memory, the foregoing is true and correct this _____th day of August, 2008.

_____
**Fernando Rodriguez**
Declarant



# EXHIBIT C

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION

Page 1 of 7

| 1. Program Code | | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|---|
| 5. By: SA Tracy Huxman At: Imperial County DO Imperial, CA | | ☐ ☐ ☐ ☐ ☐ | | 6. File Title RODRIGUEZ-Mendoza, Fernando | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | | 8. Date Prepared 06/30/08 | |
| 9. Other Officers: SA Craig Moore | | | | | |

10. Report Re: June 29, 2008 Arrest of Fernando RODRIGUEZ-Mendoza and Seizure of Exhibit 1.

## DEFENDANTS

RODRIGUEZ-Mendoza, Fernando - NADDIS: Negative
Sex: Male, Race: White, Ethnicity: Hispanic, Hair: Black, Eyes: Brown,
Weight: 180 lbs, Height: 5'09", DOB: 04/02/1976, POB: Colima, Mexico,
Address: 148 North 21st Avenue, Yuma, AZ, Home Phone: 928-783-9240, AZ DL
number: D04600143, SSN: 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.

## VIOLATIONS

Title 21 USC 841 (a) (1) - Possession With Intent to Distribute Marijuana.

## JUDICIAL DISTRICT

Southern District of California.

## DATE/TIME/PLACE

June 29, 2008, at approximately 2:30 PM at the Highway 86 United States
Border Patrol Checkpoint, Westmorland, California.

## DRUG EXHIBITS

1.   Exhibit 1 - Described as 9 bundles individually wrapped in cellophane
tape containing a green leafy substance with a total gross weight of
approximately 85.32 kilograms.  On June 29, 2008, United States

| 11. Distribution: Division District Other | 12. Signature (Agent) SA Tracy Huxman | 13. Date 7/8/08 |
|---|---|---|
| | 14. Approved (Name and Title) Thomas Walsh Group Supervisor | 15. Date 8 July 08 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

2008-06-30 SUMMARY REPORT
1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

9      1

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | | |
| | 3. File Title RODRIGUEZ-Mendoza, Fernando | |
| 4. Page 2 of 7 | | |
| 5. Program Code | 6. Date Prepared 06/30/08 | |

Border Patrol (USBP) Agents seized Exhibit 1 from a white Ford F250 with Arizona license plate number AAV746 driven by Fernando RODRIGUEZ-Mendoza. On June 29, 2008, USBP agents relinquished custody of Exhibit 1 to SA Tracy Huxman, as witnessed by SA Craig Moore. Exhibit 1 was transported to the ICDO where it was processed as evidence, by SA Huxman, as witnessed by SA Craig Moore. Custody of Exhibit 1 was transferred to the ICDO evidence custodian for storage and safekeeping.

2.  Exhibit 1A-K – Described as one (1) representative sample and ten (10) core samples taken from Exhibit 1, with a total gross weight of approximately 1.04 kilograms. On June 29, 2008, United States Border Patrol (USBP) Agents seized Exhibit 1A-K from an white 2001 Ford F250 driven by Fernando RODRIGUEZ-Mendoza. On June 29, 2008, USBP agents relinquished custody of Exhibit 1A-K to SA Tracy Huxman, as witnessed by SA Craig Moore. Exhibit 1A-K was transported to the ICDO where it was processed as evidence, by SA Huxman, as witnessed by SA Craig Moore. Custody of Exhibit 1A-K was transferred to the ICDO evidence custodian for storage and safekeeping.


## NON-DRUG EVIDENCE

1.  Exhibit N-1 – Described as a 2001 white Ford F250 with Arizona license plate AAV746, VIN 3FTNF20L11MA63827. On June 29, 2008, Exhibit N-1 was seized from Fernando RODRIGUEZ-Mendoza at the HWY 86 checkpoint near Westmorland, California. SA Moore released Exhibit N-1 to Beach and Son towing for storage, pending administrative forfeiture.

2.  Exhibit N-2 – Described as miscellaneous paperwork to include the registration to Exhibit N-1, the Bill of Sale for Exhibit N-1, and the Mexico and United States vehicle insurance for Exhibit N-1. Exhibit N-2 was seized by SA Craig Moore from within exhibit N-1. On June 29, 2008, SA Moore seized Exhibit N-2 from Fernando RODRIGUEZ-Mendoza at the Highway 86 checkpoint near Westmorland, California. On the same date, Exhibit N-2 was transported to the Imperial County DEA office where SA Huxman, as witnessed by SA Joanne Camacho,

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** <br> *(Continuation)* | | |
| | 3. File Title <br> RODRIGUEZ-Mendoza, Fernando | |
| 4. <br> **Page  3  of  7** | | |
| 5. Program Code | 6. Date Prepared <br> 06/30/08 | |

processed Exhibit N-2 as evidence.  Exhibit N-2 is pending transfer
to the Imperial County Non-Drug Evidence Custodian for storage and
safekeeping.

3.    Exhibit N-3 - Described as one silver Motorola Razer cell phone.  On
June 29, 2008, SA Craig Moore seized Exhibit N-3 from Fernando
RODRIGUEZ-Mendoza at the Highway 86 checkpoint near Westmorland,
California.  On the same date, SA Huxman, as witnessed by SA Craig
Moore, transported Exhibit N-3 to the Imperial County DEA office
where SA Huxman, as witnessed by SA Joanne Camacho, processed Exhibit
N-3 as evidence.  Exhibit N-3 is pending transfer to the Imperial
County Non-Drug Evidence Custodian for storage and safekeeping.

4.    Exhibit N-4 - Described as one black Motorola i425 cell phone with
carrying case.  On June 29, 2008, SA Craig Moore seized Exhibit N-4
from Fernando RODRIGUEZ-Mendoza at the Highway 86 checkpoint near
Westmorland, California.  On the same date, SA Huxman, as witnessed
by SA Craig Moore, transported Exhibit N-4 to the Imperial County DEA
office where SA Huxman, as witnessed by SA Joanne Camacho, processed
Exhibit N-4 as evidence.  Exhibit N-4 is pending transfer to the
Imperial County Non-Drug Evidence Custodian for storage and
safekeeping.

5.    Exhibit N-5 - is described as one box of property seized from
Fernando RODRIGUEZ-Mendoza.  On June 29, 2008, SA Craig Moore seized
Exhibit N-5 from Fernando RODRIGUEZ-Mendoza at the Highway 86
checkpoint near Westmorland, California.  On the same date, SA Tracy
Huxman, as witnessed by SA Moore, transported Exhibit N-5 to the
Imperial County DEA office where SA Huxman, as witnessed by SA Joanne
Camacho, processed Exhibit N-5 as evidence.  Exhibit N-5 is pending
transfer to the Imperial County Non-Drug Evidence Custodian for
storage and safekeeping.

## VEHICLES

A 2001 white Ford F250 with Arizona license plate AAV746, VIN
3FTNF20L11MA63827.  SA Huxman checked the VIN in the Department of Motor

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**1 - Prosecutor**

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|
| *(Continuation)* | | | |
| 4. **Page 4 of 7** | 3. File Title RODRIGUEZ-Mendoza, Fernando | | |
| 5. Program Code | 6. Date Prepared 06/30/08 | | |

Vehicles and found this vehicle does not have a lien holder and is registered to Fernando RODRIGUEZ-Mendoza, 3505 W. 3rd Place, Yuma, Arizona 85364-1591. RODRIGUEZ-Mendoza told agents that he owned the Ford F250. RODRIGUEZ-Mendoza also told agents that he had borrowed $5,000 from a friend, whose name he did not know. RODRIGUEZ-Mendoza stated that he purchased the vehicle from an individual by the name of "Mike" in Yuma, Arizona. Located inside the Ford F250 was a Bill of Sale for the vehicle. According to the Bill of Sale, on May 13, 2008, RODRIGUEZ-Mendoza purchased the vehicle for $5,500 from Keithly-Williams Seeds, Incorporated in California. The witness on the Bill of Sale is Mike Padilla.

Beach and Son towing was called and took possession of the white Ford F250 pending administrative forfeiture.

## ACTION OF DEFENDANTS

On July 1, 2008, Fernando RODRIGUEZ-Mendoza appeared before United States Magistrate Peter Lewis in El Centro, California; criminal case number 08 MJ 8589.

## WITNESSES

United States Border Patrol
Patrol Agent Supervisor Efrain Gonzalez
Patrol Agent Raymond Vega
Patrol Agent Scott Marino
Patrol Agent David Gonzalez
Patrol Agent Veronica Lozano


Drug Enforcement Administration
SA Tracy Huxman
SA Craig Moore

## DETAILS

1.    Reference is made to U.S. Border Patrol (USBP) Report of Apprehension or Seizure:  IDO0806000083, dated June 29, 2008, by USBP Agent

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

12        4

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ▓▓▓▓▓▓ | ▓▓▓▓▓ |
| | 3. File Title RODRIGUEZ-Mendoza, Fernando | |
| 4. Page 5 of 7 | | |
| 5. Program Code | 6. Date Prepared 06/30/08 | |

Raymond Vega.  The report is in regard to the arrest of Fernando RODRIGUEZ-Mendoza and the seizure of Exhibit 1, approximately 85.32 kilograms of marijuana.

2.   On June 29, 2008, at approximately 4:30 PM, DEA Imperial County District Office (ICDO) agents were notified of the above listed seizure at the Highway 86 Checkpoint.  SA's Tracy Huxman and Craig Moore responded to the checkpoint.

3.   At approximately 7:20 PM, SA's Huxman and Moore arrived at the checkpoint.  SA Huxman spoke with USBP Agent Raymond Vega regarding the events leading up to the seizure.

4.   At approximately 7:30 PM, SA Huxman contacted Fernando RODRIGUEZ-Mendoza as he sat in a holding cell and asked if he spoke English. RODRIGUEZ-Mendoza informed SA Huxman that he did not speak English. RODRIGUEZ-Mendoza provided SA Huxman, with the translation assistance of USBP Supervisor Efrain Gonzalez, demographic information.  While receiving demographic information from RODRIGUEZ-Mendoza, he informed agents that he works as a day laborer, but hasn't worked for two months.

5.   At approximately 7:58 PM, USBP Agent Veronica Lozano read RODRIGUEZ-Mendoza his Miranda rights in Spanish from a Drug Enforcement Administration 13a card.  RODRIGUEZ-Mendoza acknowledged that he understood his rights.  RODRIGUEZ-Mendoza agreed to waive his rights and answer questions.  Agent Lozano translated for SA's Huxman and Moore during the interview of RODRIGUEZ-Mendoza.

6.   RODRIGUEZ-Mendoza advised that on June 24, 2008, he went to Mexico after a fight with his wife, Gabriella FELIX-Rodriguez.  While in Mexico, RODRIGUEZ-Mendoza stated that he stayed in a hotel. According to RODRIGUEZ-Mendoza, he didn't come back into the United States until June 29, 2008 between 11 AM and 12 PM.  RODRIGUEZ-Mendoza stated that he was alone in his white Ford F250 with AZ license plate number AAV7486 when he crossed back into the United States.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

13      5

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
| *(Continuation)* | | |
| | 3. File Title | |
| | RODRIGUEZ-Mendoza, Fernando | |

| 4. | |
| Page 6 of 7 | |
| 5. Program Code | 6. Date Prepared |
| | 06/30/08 |

7. After he crossed into the United States, RODRIGUEZ-Mendoza went to his house at 148 North 21st Avenue, Yuma, Arizona. RODRIGUEZ-Mendoza said that he left his residence in Yuma at approximately 1 PM and drove directly to the Highway 86 Border Patrol Checkpoint. Furthermore, RODRIGUEZ-Mendoza advised that he didn't stop between leaving 148 North 21st Avenue, Yuma, Arizona and the Highway 86 checkpoint.

8. RODRIGUEZ-Mendoza informed agents that he was traveling to Indio to an apartment complex called the Palms. He stated that he was to meet a friend, Jose, at the apartment complex; however, RODRIGUEZ-Mendoza was unable to provide his friends last name. He also said that he was going to Indio for a job.

9. According to RODRIGUEZ-Mendoza, he bought the truck from a man named Mike in Yuma, AZ two months ago. He couldn't provide the name of the car lot nor could he provide the last name of Mike, the individual that sold him the car. However, he said that the car lot he bought the vehicle from was on 32nd Avenue and 4th Street in Yuma, AZ. RODRIGUEZ-Mendoza said that it is located next to a store that sells weapons. He said that the Ford F250 cost $5,000. Agents asked how RODRIGUEZ-Mendoza paid for the truck, since he earlier advised agents that he hasn't worked for about two months. RODRIGUEZ-Mendoza said that his friend Pedro loaned him the money. However, RODRIGUEZ-Mendoza didn't know Pedro's last name.

10. SA Moore located a Bill of Sale inside the Ford F250, Exhibit N-2. According to the Bill of Sale, RODRIGUEZ-Mendoza purchased the vehicle on May 13, 2008 for $5,500.00 from Keithly-Williams Seeds, Incorporated. The witness on the Bill of Sale is Mike Padilla.

11. In addition, RODRIGUEZ-Mendoza said that the truck was purchased with the auxiliary fuel tank mounted in the bed of the truck. However, RODRIGUEZ-Mendoza told agents that he was unaware of the marijuana found in the vehicle.

12. Furthermore, RODRIGUEZ-Mendoza had two cellular telephones that he advised were his. Although, he advised that the cell phones belonged

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor
14

6

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| 4.<br>Page 7 of 7 | 3. File Title<br>RODRIGUEZ-Mendoza, Fernando | |
| 5. Program Code | 6. Date Prepared<br>06/30/08 | |

to him, he was unable to provide the agents with the telephone numbers.

13. At approximately 8:17 PM, the interview ended.

14. SA Huxman requested the surveillance video of the seizure from USBP agent Vega. USBP agent Vega told SA Huxman that she (SA Huxman) would need to contact a supervisor at the Indio office. On June 30, 2008, SA Huxman then informed GS Thomas Walsh. GS Walsh spoke to Patrol Agent Supervisor William Breck, requesting the video. GS Walsh was later told by Patrol Agent Supervisor Breck that they would not be able to provide the surveillance video.

15. SA's Huxman and Moore completed paperwork and fingerprinted RODRIGUEZ-Mendoza. SA Moore seized from the Ford F250 Exhibits N-2. The marijuana was loaded for transportation to the Imperial County DEA office. Beach and Son towing responded to the checkpoint for the vehicle.

16. At approximately 9:00 PM, SA's Huxman and Moore, along with RODRIGUEZ-Mendoza and the marijuana, departed the checkpoint. Exhibit 1 was transported back to the Imperial County DEA office and placed in temporary storage. RODRIGUEZ-Mendoza was then transported and lodged at the Imperial County Jail.

<u>INDEXING</u>

1. RODRIGUEZ-Mendoza, Fernando - NADDIS Negative
   HMA; Hair: Black, Eyes: Brown, Weight: 180 lbs, Height: 5'09", DOB: 04/02/1976, POB: Colima, Mexico, Address: 148 North 21st Avenue, Yuma, AZ, Home Phone: 928-783-9240, AZ DL number: D04600143, SSN: 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.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

MAGISTRATE CASE NUMBER: _08 MJ 2589_

1. Hearing Date _7/01/2008_          2. AUSA _KKD_          3. Mag Judge: _Lewis_

4. USAO # __          5. Agency # __DEA__

6. Defendant #: __1__ of __1__     7. Case Agents: Craig Moore/Tracy Huxman

8. Charges: __21 USC 841 (a)(1)__

9. Defendant's Name: RODRIGUEZ-Mendoza, Fernando     10. Social Security #: __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__

11. Alias: __          12. Birth Date: __4/2/1976__ (32)

13. Address: __148 North 21st Avenue, Yuma, Arizona 85364__

14. Arrest Date: 6/29/2008 15. Place of Arrest: Hwy 86 BP Checkpoint, Westmoreland, CA 16. Date Committed: _6/29/2008_

17. Agent(s): _Moore/Huxman_          18. Office Phone #: 760-355-0857

19. Agency: __Drug Enforcement Administration__     20. Station: Imperial County District Office

21. Custody: Yes __X__    No _____

22. Citizenship: U.S. __    Mex __X__    Other_____

23. INS Status: Res __XX__    BCC __    Illegal _____    Other _____

24. Prior Deports: __None__          25. IDENT Hits: _____

26. Prior Record: None __ _Confirmed by PTS_

27. Drug Usage: Methamphetamine. How Evidenced? __Admission - Last Used 6/28/2008__

28. Cash on Defendant: __$20.00__   29. Other Evidence __   _188.10 lbs._

30. Agents Fact Summary: Rodriguez-Mendoza was arrested with 85.32 kilograms of marijuana.

31. Agents info re: defendant (Employment, Family, etc.) Unemployed. Lives in Yuma, AZ  No local ties to the Imperial County.

32. Def Attorney: Appointed __✓__     Retained _____

33. DEFENSE ATTORNEY: __F.D.__          PHONE NUMBER: _____

34. Next Date for: PH Removal Date _7-15-08_  Time 1 _PCL_ Detention Date _____ Time _____

35. Bond Set: _$20K c/esb._

36. Material Witness Custodial Status: Custody _____   Not in Custody

37. MATERIAL WITNESS ATTORNEY: _____          PHONE NUMBER: _____

Court's Orders/Motions Government's Notes for Bail

_____

_____

_____

MJ Info Sheet (lb) 11/5/04

16     8



**EXHIBIT D**

# U.S. District Court

## Southern District of California (San Diego)

## CRIMINAL DOCKET FOR CASE #: 00-CR-2-ALL

### USA v. Estrada-Rendon

Filed: 01/05/00
Other Dkt # 3:99-m -03118

### Case Assigned to: Judge M. James Lorenz

MONICA ESTRADA-RENDON (1)
   defendant
  [term 01/10/01]

Federal Defenders
 [term 01/10/01]
 (619)687-2666
 [COR LD NTC pda]
 Federal Defenders of San Diego
 225 Broadway
 Suite 900
 San Diego, CA 92101-5008
 (619)234-8467
 James M Hodges
  [term 01/04/00]
 [COR LD NTC ret]
 Law Offices of James M Hodges
 2601 East Willow Street
 Signal Hill, CA 90806-2214
 (310)891-6100

Pending Counts:
21:841(a)(1) - Possession of
marijuana with intent to
distribute (felony)
(1)

Offense Level (opening): 4

Terminated Counts:
  NONE

Complaints:
  NONE

U. S. Attorneys:
  U S Attorney CR
  (619)557-5917

Disposition
Cust of the BOP for a term of
37 months. Supervised release
for a term of 3 years. P/A of
$100. No fine.
(1)

declaration to 13 days by Monica Estrada-Rendon; motion hrg set for 2/7/00 at 2:00 pm (meg) [Entry date 01/28/00]

1/28/00  17   ORDER by Judge M. J. Lorenz as to defendant Monica Estrada-Rendon granting motion to shorten time to file declaration to 13 days [16-1] (meg) [Entry date 01/28/00]

1/28/00  18   DECLARATION of Ms. Estrada-Rendon as to Monica Estrada-Rendon in support of motions to suppress evidence and to suppress statements (meg) [Entry date 01/28/00]

2/3/00  19   Application by plaintiff USA for order shortening time to file its response and opposition (meg) [Entry date 02/04/00]

2/3/00  20   ORDER by Judge M. J. Lorenz as to defendant Monica Estrada-Rendon granting application for order shortening time for government to file its response and opposition [19-1] for filing on 2/3/00 with hrg to be held on 2/7/00 at 2:00 pm (meg) [Entry date 02/04/00]

2/3/00  21   RESPONSE and opposition by plaintiff USA to motion to suppress evidence [14-1], motion to suppress statements [14-2], motion preserve evidence [14-3], motion to compel discovery [14-4], motion leave to file further motions [14-5] (meg) [Entry date 02/04/00]

2/3/00  21   Notice of Motion and Motion for reciprocal discovery by USA as to Monica Estrada-Rendon; motion hrg set for 2/7/00 at 2:00 pm (meg) [Entry date 02/04/00]

2/7/00  22   Minutes: Enter Order by Judge M. J. Lorenz, Motion in limine hearing set for 2:00 6/19/00 for Monica Estrada-Rendon; trial set for 9:00 6/27/00 for Monica Estrada-Rendon before Judge M. J. Lorenz  Court Reporter: Jeannette Hill (meg) [Entry date 02/08/00]

6/19/00  23   Minutes: Enter Order by Judge M. J. Lorenz, Motion in limine hearing cont to 2:00 9/5/00 for Monica Estrada-Rendon, trial cont to 9:00 9/6/00 for Monica Estrada-Rendon before Judge M. J. Lorenz ; Court Reporter: Jeannette Hill (meg) [Entry date 06/22/00]

8/31/00  24   TRIAL Memorandum by plaintiff USA (meg) [Entry date 09/01/00]

9/5/00  25   Minutes: Enter Order by Judge M. J. Lorenz, Motion in limine hearing cont to 9:00 9/6/00 for Monica Estrada-Rendon before Judge M. J. Lorenz ; Court Reporter: J. Hill (meg) [Entry date 09/07/00]

9/6/00  26   PROPOSED Jury Instructions by plaintiff USA (meg) [Entry date 09/08/00]

9/6/00  --   Jury Trial Began (1st day), Jury impaneled as to Monica Estrada-Rendon, swore witnesses, exhibits marked/received, jury trial cont to 9:00 9/7/00 for Monica Estrada-Rendon before Judge M. J. Lorenz (meg) [Entry date 09/08/00]

9/7/00  --   Trial Minutes (2nd day), swore witnesses, exhibits marked and received, dfts oral mot for Rule 29 - denied, jury

2

1        SAN DIEGO, CALIFORNIA; WEDNESDAY, 09/06/00; 9:08 A.M.

2              DEPUTY CLERK:  NO. 3 ON CALENDAR, CASE

3     NO. 00CR0002, UNITED STATES OF AMERICA VERSUS MONICA

4     ESTRADA-RENDON, FOR JURY TRIAL, DAY ONE.

5              MR. PETRIK:  GOOD MORNING, YOUR HONOR.  MICHAEL

6     PETRICK, FEDERAL DEFENDERS, FOR MS. ESTRADA.  SHE IS PRESENT

7     ON BOND.

8              THE COURT:  GOOD MORNING, MR. PETRICK.

9              MR. SUAREZ:  GOOD MORNING, YOUR HONOR.  JAMIE

10    SUAREZ FOR THE UNITED STATES.  AND MR. KAPLAN WILL BE

11    JOINING ME.

12             MR. PETRIK:  YOUR HONOR, I WANT TO APOLOGIZE TO

13    EVERYBODY FOR YESTERDAY.  I WAS STUCK IN SOME OTHER

14    COURTROOM.

15             THE COURT:  IT'S BEYOND YOUR CONTROL SOMETIMES.

16             MR. SUAREZ:  SOME OF THE MATTERS TOOK LONGER THAN

17    I THOUGHT THEY WOULD, AND I COULDN'T MAKE IT DOWN HERE ON

18    TIME.

19             THE COURT:  THAT'S OKAY.  WE'LL DO IT THIS

20    MORNING.

21             MR. PETRIK:  THANKS.

22             THE COURT:  ALL RIGHT.  WE HAVE THE MOTIONS,

23    OBVIOUSLY, TO DEAL WITH, AND SUPPRESSED EVIDENCE, AND

24    SUPPRESSED STATEMENTS.  WE WERE GOING TO HAVE A

25    VOLUNTARINESS HEARING, WERE WE NOT?

ARELLANO - DIRECT BY SUAREZ

3

1        MR. SUAREZ: YES, YOUR HONOR.

2        THE COURT: WHY DON'T WE. I THINK WE CAN DEAL

3    WITH BOTH THOSE ISSUES WITH HAVING THE HEARING. SO ARE WE

4    READY TO PROCEED?

5        MR. SUAREZ: YES, YOUR HONOR. THE GOVERNMENT

6    CALLS ERNESTO ARELLANO TO THE STAND.

7    ERNESTO ARELLANO, GOVERNMENT WITNESS, TESTIFIED AS

8    FOLLOWS:

9        DEPUTY CLERK: PLEASE STEP FORWARD. PLEASE STOP

10   AND RAISE YOUR RIGHT HAND.

11       DO YOU SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL

12   GIVE IN THE CAUSE NOW BEFORE THE COURT IS THE TRUTH, THE

13   WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

14       THE WITNESS: YES, I DO.

15       DEPUTY CLERK: PLEASE HAVE A SEAT. PLEASE STATE

16   YOUR NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

17       THE WITNESS: ERNESTO ARELLANO, JUNIOR,

18   A-R-E-L-L-A-N-O.

19                    **DIRECT EXAMINATION**

20   BY MR. SUAREZ:

21   Q.    GOOD MORNING, MR. ARELLANO.

22   A.    GOOD MORNING.

23   Q.    CAN YOU TELL US WHO YOU ARE EMPLOYED WITH?

24   A.    UNITED STATES BORDER PATROL.

25   Q.    HOW LONG HAVE YOU BEEN WITH THE BORDER PATROL?

ARELLANO - DIRECT BY SUAREZ

4

1    A.    ABOUT TWO YEARS.

2    Q.    WHAT IS YOUR CURRENT TITLE?

3    A.    BORDER PATROL AGENT.

4    Q.    AND YOUR CURRENT ASSIGNMENT?

5    A.    SAN CLEMENTE STATION.

6    Q.    DIRECTING YOUR ATTENTION TO NOVEMBER 29TH OF LAST YEAR,

7    IN THE MORNING. WERE YOU ASSIGNED TO WORK THAT DAY?

8    A.    YES, I WAS.

9    Q.    WHERE WERE YOU ASSIGNED?

10    A.    I WAS -- AT THE TIME I WAS ASSIGNED IN THE SECONDARY

11    INSPECTION AREA AT THE SAN CLEMENTE CHECKPOINT.

12    Q.    SAN CLEMENTE CHECKPOINT?

13    A.    YES, SIR.

14    Q.    AND IN YOUR DUTIES AS A SECONDARY INSPECTOR, DID YOU

15    COME ACROSS A 1995 BMW?

16    A.    YES, SIR. I DID.

17    Q.    DO YOU RECALL THE PERSON THAT WAS DRIVING THE VEHICLE?

18    A.    YES, I DO.

19    Q.    CAN YOU DESCRIBE THE DRIVER AS YOU REMEMBER HER?

20    A.    AS I REMEMBER, SHE WAS MEDIUM HEIGHT, ABOUT 5'6', 5'5'.

21    SHE HAD ABOUT SHOULDER LENGTH HAIR, KIND OF REDDISH-BROWN.

22    I THINK SHE WAS WEARING A DARK SUIT.

23    Q.    WAS THERE ANYONE ELSE IN THE VEHICLE?

24    A.    NO, SIR. SHE WAS DRIVING BY HERSELF.

25    Q.    AND LOOKING AROUND THE COURTROOM, DO YOU SEE THE PERSON

ARELLANO - DIRECT BY SUAREZ

5

1    THAT WAS DRIVING THAT 1995 BMW?

2    A.    YES, SIR. I DO.

3    Q.    CAN YOU PLEASE TELL US WHERE SHE IS LOCATED AND

4    DESCRIBE AN ARTICLE OF CLOTHING SHE IS WEARING.

5    A.    SHE IS TO THE RIGHT OF HER ATTORNEY, WEARING A BLACK

6    SUIT.

7            MR. SUAREZ:  MAY THE RECORD IDENTIFY THE

8    DEFENDANT, YOUR HONOR?

9            THE COURT:  YES.

10   Q.    (BY MR. SUAREZ):  DO YOU RECALL HOW SHE GOT TO

11   SECONDARY?

12   A.    SHE WAS SENT OVER BY -- AGENT SCHISMENOS WAS WORKING

13   THE HIGHWAY.

14   Q.    WHAT HAPPENED WHEN SHE ARRIVED AT THE SECONDARY

15   INSPECTION?

16   A.    SHE ARRIVED IN THE SECONDARY AND I PROCEEDED WITH MY

17   LINE OF QUESTIONING, WITH MY IMMIGRATION INSPECTION.

18   Q.    AT ANY TIME WHEN THE DEFENDANT WAS IN SECONDARY, DID

19   YOU REQUEST PERMISSION TO LOOK IN THE TRUNK?

20   A.    YES, I DID.

21   Q.    WHY DID YOU REQUEST PERMISSION TO LOOK IN THE TRUNK?

22   A.    BECAUSE WE REQUIRE CONSENT FROM ALL OWNERS OF VEHICLES

23   OR PEOPLE IN THE VEHICLE, TO LOOK IN THE TRUNK.

24   Q.    AND HOW DID THE DEFENDANT REPLY?

25   A.    FRIENDLY.  SHE SAID NO PROBLEM.

# EXHIBIT E

1                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF CALIFORNIA
2

3

4   UNITED STATES OF AMERICA,         )
                               )
5                  PLAINTIFF,     )CASE NO. 99CR3383-JM
                               )
6        VS.                           )
                               )SAN DIEGO, CALIFORNIA
7   BOOKER WILLIAMS,            )FEBRUARY 25, 2000
                               )2:30 P.M.
8                  DEFENDANT.     )
       _____ )

9

10

11                 TRANSCRIPT OF MOTION HEARING
12          BEFORE THE HONORABLE JEFFREY T. MILLER
              UNITED STATES DISTRICT JUDGE
13

14

15

16

APPEARANCES:
17   FOR THE GOVERNMENT:           GREGORY A. VEGA, U.S. ATTORNEY
                            BY: JUAN MASINI, ESQ.
18                           U.S. ASSISTANT ATTORNEY
                            880 FRONT STREET
19                           SAN DIEGO, CA. 92101

20

    FOR DEFENDANT:                 FEDERAL DEFENDERS, INC.
21                           BY: MICHAEL PETRIK, JR., ESQ.
                            225 BROADWAY, STE. 900
22                           SAN DIEGO,CA. 92101

23

24   COURT REPORTER:                EVA OEMICK
                            TEL: (619) 615-3103
25                           FAX: (619) 265-8922

                COMPUTER-AIDED TRANSCRIPTION

21

1    RECOGNIZED THAT HE RECOGNIZED THE VEHICLE AS WELL AS A LOOKOUT.

2         THE COURT:  WHAT DID HE SAY?

3         THE WITNESS:  HE DIDN'T SAY ANYTHING VERBALLY.  I

4    COULD TELL THAT HE -- THAT THAT WAS THE VEHICLE.

5         THE COURT:  HOW DO YOU KNOW THAT HE KNEW THAT WAS THE

6    VEHICLE AND WAS IDENTIFYING IT AS THE LOOKOUT VEHICLE?

7         THE WITNESS:  JUST FACIAL MOVEMENT.

8         THE COURT:  DID HE SIGNAL YOU IN SOME WAY?

9         THE WITNESS:  I DON'T REMEMBER EXACTLY WHAT SIGNAL HE

10   USED.  I JUST NOTICED A RECOGNITION.  IT WAS JUST OBVIOUS THAT

11   WAS THE VEHICLE THAT WE HAD TO LOOK OUT FOR, BUT I DID NOTICE

12   IT MYSELF.

13        THE COURT:  THANK YOU.  YOU ARE EXCUSED AT THIS TIME.

14   THANK YOU.

15        MR. MASINI, YOU MAY CALL YOUR NEXT WITNESS.

16        MR. MASINI:  WE CALL AGENT MULLENS.

17

18                  WILLIAM MULLENS

19   WAS CALLED AS A WITNESS, AND AFTER HAVING BEEN DULY SWORN,

20   TESTIFIED AS FOLLOWS:

21

22        THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD AND

23   SPELL YOUR LAST NAME.

24        THE WITNESS:  WILLIAM MULLENS, M-U-L-L-E-N-S.

25   //

COMPUTER-AIDED TRANSCRIPTION

22

1                              DIRECT EXAMINATION

2    BY MR. MASINI:

3    Q.    GOOD AFTERNOON, AGENT MULLENS.

4    A.    GOOD AFTERNOON.

5    Q.    BY WHOM ARE YOU EMPLOYED?

6    A.    UNITED STATES BORDER PATROL.

7    Q.    AND WHAT POSITION DO YOU HAVE WITH THE UNITED STATES

8    BORDER PATROL?

9    A.    BORDER PATROL AGENT.

10   Q.    AND HOW LONG HAVE YOU BEEN A BORDER PATROL AGENT?

11   A.    APPROXIMATELY FOUR YEARS.

12   Q.    AND BRIEFLY FOR THE RECORD, WHAT'S THE GENERAL TRAINING AS

13   A BORDER PATROL AGENT?

14   A.    GENERAL TRAINING CONSISTED OF APPROXIMATELY FIVE MONTHS IN

15   GLENCO, GEORGIA AT THE FEDERAL LAW ENFORCEMENT TRAINING CENTER

16   WHICH COVERED IMMIGRATION LAW, TITLE 21 AUTHORITY, GENERAL

17   INVESTIGATION, EXTENSIVE SPANISH TRAINING, AND JUST GENERAL

18   POLICE ACTIVITY.

19   Q.    YOU ALSO HAVE RECEIVED ON-THE-JOB TRAINING, I TAKE IT?

20   A.    YES, I HAVE.

21   Q.    NOW, I'D LIKE TO JUST QUICKLY FOCUS YOUR ATTENTION ON THE

22   EVENTS OCCURRING ON NOVEMBER 4, 1999?

23   A.    YES, SIR.

24   Q.    WHERE WERE YOU STATIONED?

25   A.    AT THE CAMPO BORDER PATROL STATION.

COMPUTER-AIDED TRANSCRIPTION

23

1   Q.   NOW, WERE YOU WORKING ON THAT DAY OF NOVEMBER 4TH?

2   A.   YES, I WAS.

3   Q.   AND WHAT SHIFT DID YOU HAVE?

4   A.   I HAD THE DAY SHIFT WHICH WAS 7:00 A.M. TO 5:00 P.M.

5   Q.   AND WHERE SPECIFICALLY -- WHERE WERE YOU ASSIGNED ON THAT

6   DAY?

7   A.   THAT DAY I WAS ASSIGNED TO INTERSTATE 8 BORDER PATROL

8   CHECKPOINT.

9   Q.   AND WHERE IS THE INTERSTATE BORDER PATROL CHECKPOINT

10  SPECIFICALLY LOCATED?

11  A.   IT IS IN PINE VALLEY, CALIFORNIA.  IT IS ON I-8 WESTBOUND

12  BETWEEN BUCKMAN SPRINGS AND SUNRISE HIGHWAY.

13  Q.   IS THIS A PERMANENT CHECKPOINT?

14  A.   YES, SIR.

15  Q.   IS IT CLEARLY MARKED?

16  A.   YES, IT IS.

17  Q.   HOW IS IT MARKED?

18  A.   WE HAVE APPROXIMATELY 70 CONES, APPROXIMATELY EIGHT OR

19  NINE SIGNS.  WE HAVE FLASHING YELLOW SIGNS.  WE HAVE FLASHING

20  RED LIGHTS, AND WE HAVE ALSO THE STATION ITSELF.

21  Q.   AND WAS IT FULLY OPERATIONAL ON THAT DAY?

22  A.   YES, IT WAS.

23  Q.   AND HOW OFTEN IS IT OPERATIONAL?  HOW OFTEN IS THAT

24  CHECKPOINT OPERATIONAL?

25  A.   IT IS OPERATIONAL 24, SEVEN, DEPENDING ON WEATHER

COMPUTER-AIDED TRANSCRIPTION

1  TESTIMONY TODAY?

2  A.   YES, I DID.

3  Q.   WAS THAT AGENT JAMILE'S REPORT?

4  A.   YES, IT WAS.

5  Q.   FOUR-PAGE REPORT, RIGHT?

6  A.   YES, SIR.

7  Q.   DID YOU REVIEW ANYTHING ELSE?

8  A.   NO, SIR.

9  Q.   YOU, YOURSELF, DIDN'T WRITE ANY REPORTS, RIGHT?

10  A.   NO, I DID NOT.

11  Q.   NOW, YOU SAID THAT THE VEHICLE CAME INTO SECONDARY FAST,

12  RIGHT?

13  A.   THAT IS CORRECT.

14  Q.   AND YOU DEPLOYED A SPIKE STRIP?

15  A.   THAT'S CORRECT.

16  Q.   YOU THOUGHT THE VEHICLE WAS GOING TO GO THROUGH SECONDARY,

17  RIGHT?

18  A.   THAT IS ALSO CORRECT.

19  Q.   THERE IS NO QUESTION THAT THE DRIVER OF THAT VEHICLE WAS

20  NOT FREE TO LEAVE SECONDARY AT THAT POINT, RIGHT?

21  A.   I AM SORRY.  WOULD YOU REPEAT YOUR QUESTION?

22  Q.   I SAID THERE IS NO QUESTION THAT AT THAT POINT IN TIME THE

23  DRIVER WAS NOT FREE TO LEAVE SECONDARY INSPECTION, RIGHT?

24  A.   IF A VEHICLE IS PLACED IN SECONDARY, IT IS NOT FREE TO

25  LEAVE UNTIL IT IS RELEASED.  ANYWAY, I DON'T UNDERSTAND YOUR

COMPUTER-AIDED TRANSCRIPTION

30

1    QUESTION FULLY.

2    Q.    IF A VEHICLE IS IN SECONDARY, IS IT BORDER PATROL POLICY

3    THAT THAT VEHICLE IS NOT FREE TO LEAVE UNTIL SOME AGENT TELLS

4    THE DRIVER TO GO AHEAD?

5    A.    THAT'S THE CUSTOM AND PRACTICE, YES.

6    Q.    BUT IN THIS CASE THERE WAS SOMETHING PHYSICALLY BLOCKING

7    THE EXIT TO SECONDARY TOO, RIGHT?

8    A.    DIRECTLY IN FRONT OF THIS VEHICLE, YES.  THERE IS ALSO

9    EXITS TO THE LEFT SIDE.

10   Q.    IN OTHER WORDS, THE DRIVER OF THE VEHICLE COULDN'T GO

11   STRAIGHT THROUGH WITHOUT PUNCTURING THE TIRES?

12   A.    RIGHT.

13   Q.    NOW, AT THE TIME -- LET ME BACK UP A MINUTE -- STRIKE

14   THAT.

15          YOU WERE CONCERNED WITH THE SITUATION WHEN THE

16   VEHICLE CAME INTO SECONDARY FAST, RIGHT?

17   A.    THAT'S CORRECT.

18   Q.    AND THERE ARE OTHER AGENTS IN SECONDARY TOO?

19   A.    THAT'S CORRECT.

20   Q.    ALL YOU GUYS WERE CONCERNED THAT THE VEHICLES WAS GOING TO

21   FLEE, RIGHT?

22   A.    YES.

23   Q.    YOU WERE THERE, RIGHT?

24   A.    I CAN'T SPEAK FOR THE OTHER OFFICERS, BUT MYSELF, YES.

25   Q.    YOU PERSONALLY WERE CONCERNED THAT IT WAS GOING TO FLEE

COMPUTER-AIDED TRANSCRIPTION

36

1    Q.    AND THE LOOKOUT WAS FOR A SMALL BLUE CAR, RIGHT?

2    A.    CORRECT.

3    Q.    AND THE LOOKOUT GAVE A PARTIAL PLATE, RIGHT?

4    A.    THAT'S CORRECT.

5    Q.    AND THE LOOKOUT ALSO SAID THAT SOMEONE PUT DUFFEL BAGS

6    INTO THE BACK OF THE CAR, RIGHT?

7    A.    I DIDN'T RECALL HEARING THAT PART OF THE LOOKOUT.  I HEARD

8    THAT A VEHICLE WAS LOADING SOMETHING IN THE TRUNK ON TIERRA DEL

9    SOL.

10   Q.    AND TIERRA DEL SOL IS A ROAD THAT'S NOT ON I-8?

11   A.    IT IS A ROAD AND ALSO A COMMUNITY.

12   Q.    NOW, AT THE TIME RIGHT -- EXCUSE ME -- STRIKE THAT.

13          RIGHT AFTER AGENT BLACKWELL SAID THAT THE CANINE

14   ALERTED, AGENT JAMILE ASKED FOR CONSENT TO OPEN THE TRUNK?

15   A.    THAT IS CORRECT.

16   Q.    AND AGENT JAMILE DIDN'T TELL THE DRIVER THAT HE HAD THE

17   RIGHT NOT TO CONSENT, RIGHT?

18   A.    HE DIDN'T SPECIFICALLY TELL HIM "YOU CAN SAY YES OR NO."

19   HE ASKED FOR CONSENT TO SEARCH THE TRUNK.

20   Q.    HE DIDN'T SAY, "YOU HAD THE RIGHT NOT TO GIVE THIS

21   PERMISSION NOT TO OPEN THE TRUNK," RIGHT?

22   A.    NO, HE DID NOT.

23   Q.    AND AT THAT POINT THE DRIVER WAS NOT FREE TO LEAVE, RIGHT?

24   A.    NOT AT THAT POINT, NO.

25   Q.    NO ONE HAD READ THE DRIVER HIS MIRANDA RIGHTS, RIGHT?

COMPUTER-AIDED TRANSCRIPTION

1  A.  HE WAS NOT UNDER ARREST.

2  Q.  BUT NO ONE HAD READ HIM HIS MIRANDA RIGHTS, RIGHT?

3  A.  HE WAS NOT UNDER ARREST.  WE DIDN'T READ HIS MIRANDA

4  RIGHTS TO HIM, NO.

5  Q.  YOU DIDN'T ASK THE DRIVER TO SIGN A FORM TO CONSENT TO

6  OPEN THE TRUNK, RIGHT?

7  A.  NO, WE DID NOT.

8  Q.  AND YOU DIDN'T TELL THE DRIVER THAT YOU COULD GO GET A

9  WARRANT TO LOOK IN THE TRUNK, RIGHT?

10  A.  NO, WE DID NOT.

11  Q.  AND THEN YOU TOOK THE KEYS FROM THE DRIVER AND OPENED THE

12  TRUNK?

13  A.  I DON'T RECALL WHERE I GOT THE KEYS, WHETHER THEY WERE OUT

14  OF THE IGNITION OR FROM MR. WILLIAM.

15  Q.  THEY WERE IN YOUR POSSESSION, THE KEYS?

16  A.  WHEN I OPENED THE TRUNK THEY WERE.

17  Q.  AND YOU DID THAT?

18  A.  I OPENED THE TRUNK, CORRECT.

19  Q.  NOW, AGENT JAMILE DIDN'T SAY "MAY I HAVE YOUR CONSENT TO

20  OPEN THE TRUNK," DID HE?

21  A.  HE SAID "MAY WE LOOK IN THE TRUNK OF YOUR VEHICLE?"

22  Q.  THAT'S EXACTLY WHAT HE SAID?

23  A.  THAT WAS PRETTY CLOSE TO THAT, I BELIEVE.

24  Q.  "MAY WE LOOK IN YOUR VEHICLE"?

25  A.  "MAY WE LOOK IN THE TRUNK OF YOUR VEHICLE?"

COMPUTER-AIDED TRANSCRIPTION

1    Q.    DIDN'T SAY "WE ARE GOING TO LOOK IN THE TRUNK OF YOUR

2    VEHICLE."

3    A.    HE SAID, "MAY WE LOOK IN THE TRUNK OF YOUR VEHICLE?"

4    Q.    ALSO, AGENT, IT IS STANDARD POLICY OF BORDER PATROL THAT

5    WHEN A VEHICLE IS SENT TO SECONDARY, YOU LOOK IN THE TRUNK,

6    RIGHT?

7    A.    NO, IT IS NOT A STANDARD POLICY.

8    Q.    IT IS NOT AT ALL?

9    A.    NO, SIR.

10    Q.    SO ANOTHER AGENT HAD SAID THAT THAT WOULD BE STANDARD

11    POLICY THAT ALL VEHICLES IN SECONDARY ARE -- YOU ASK TO LOOK

12    INTO THE TRUNK.    THAT IS NOT TRUE?

13    A.    THERE IS NOTHING ON PAPER THAT'S IDENTIFYING THAT

14    PARTICULAR THING SAYING IT IS STANDARD POLICY.    CUSTOMARY,

15    POSSIBLY; STANDARD, NO.

16    Q.    IT IS CUSTOMARY POLICY AMONGST THE AGENTS?

17    A.    USUALLY.

18    Q.    YOU DO THAT BASED ON YOUR TRAINING AND EXPERIENCE, RIGHT?

19    A.    BASED ON THE INDIVIDUAL SITUATION WHERE THEY ASK TO LOOK

20    IN THE TRUNK, YES.

21    Q.    AT THE TIME YOU APPROACHED THE VEHICLE, YOU WERE ABLE TO

22    SEE INSIDE THE PASSENGER COMPARTMENT, RIGHT?

23    A.    PARTIALLY.    I COULDN'T SEE ON THE FLOOR.

24    Q.    FROM YOUR PROSPECTIVE YOU DIDN'T SEE ANY OTHER OCCUPANTS

25    EXCEPT THE DRIVER?

COMPUTER-AIDED TRANSCRIPTION



# EXHIBIT F

# ORIGINAL



1 | TODD W. BURNS
California State Bar No. 194937
2 | FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
3 | San Diego, California 92101-5008
Telephone No. (619) 234-8467
4 |
5 | Attorneys for Mr. Cedano-Arrellano
6 |
7 | UNITED STATES DISTRICT COURT
8 | SOUTHERN DISTRICT OF CALIFORNIA
9 | (HON. BARRY TED MOSKOWITZ)

10 | UNITED STATES OF AMERICA,            )   Criminal No. 01CR3614-BTM
11 |              Plaintiff,              )   3/7/02 @ 1:30 per Todd Burns
12 | v.                                   )
13 | JUAN PABLO CEDANO-ARRELLANO,         )   DECLARATION OF DR. DAN CRAIG
                                          )   IN SUPPORT OF MOTION TO COMPEL
14 |              Defendant.              )   DISCOVERY
15 |                                      )
16 |
17 |       I, Dan J. Craig, declare under penalty of perjury that:

18 |       1. I am an expert in animal behavior, and I have extensive experience training dogs to detect
19 | drugs and explosives. My experience in that area is highlighted in the curriculum vitae attached hereto.

20 |       2. In assessing the reliability of a drug detector dog, I need a great deal of information.
21 | That information, and the reasons it is relevant to my assessment, are set out below:

22 |       3. Training records, training manuals, written certification standards, and score sheets of
23 | the dog from the facility that initially trained and certified the dog to detect drugs. These documents allow
24 | me to assess if the dog was properly trained to detect drugs, if the dog performed acceptably in training,
25 | and what substances (and in what quantity) the dog has been trained and certified to detect.

26 |       4. All detection proficiency training records of the dog since initial certification, including
27 | trials designed by the dog handler and by the dog handler's supervisor(s). These allow me to assess
28 | whether the dog has continued to perform reliably, and if he/she is being maintained in a manner such that

00CR3357

18

FROM 6196872666          TO DAN J. CRAIG, DVM,M 3/4/2002 11:49 AM Page 2

35

his/her responses are reliable. In particular, these records allow me to determine if the dog's on-going training is adequate to maintain his/her reliability.

5. Current written performance standards for the dog and score sheets of all re-certification evaluations (such as from the United States Police Canine Association, North American Police Work Dog Association, National Narcotics Drug Detector Dog Association, or United States Customs or Border Patrol). This allows me to assess whether the dog is being required to meet basic performance standards to insure its reliability, and what substances (and in what quantity) it has been found to reliably detect under a variety of conditions that emulate real world conditions.

6. Departmental training evaluation for the dog handler and the dog handler's supervisor(s) (relating to the dog's detection work). This allows me to determine if the dog handler has been properly trained to train and manage the dog, and if the dog handler's supervisor is insuring that the dog is properly trained and maintained on a continuing basis.

7. All records of the dog's performance in real world searches since initial certification. This allows me to determine the dog's reliability on the job, and whether he/she is being properly handled. The assessment of these documents also determines if information gained on these searches is identified as subsequent training requirements.

8. Police reports, warrants, and laboratory reports relating to this dog. This allows me to determine the dog's reliability on the job. One important thing that these items allow me to determine is whether the dog is alerting to non-drug items, such as packaging materials, gasoline, oil, or other smells that the dog, as the result of poor maintenance, will begin to associate with drugs.

9. What is the dog's final response when it detects drugs and/or people? When one knows the defined initial response a dog is supposed to make when it detects controlled substances, it eliminates subjectivity by the handler.

10. What primary reward is used to control this dog's searching behavior? What are the different reward schedules this dog is working on when it is used to detect controlled substances both in training and real world searches? When is that reward given? This allows me to determine if the dog is being properly rewarded, thus insuring its on-going reliability.

//

2                                                                     00CR3357

1       11.  What substances is the dog trained to detect (*e.g.*, types of drugs, currency, explosives)?

2 This forms a basis for determining in what areas the dog is reliable.

3       12.  Reports and records regarding the dog's performance in this case.  This allows me to

4 determine the dog's on the job performance.

5       13.  Size and type of substance aids used in training (*i.e.*, quantity and type of drugs), how

6 these substances were packaged, and laboratory analysis of the aids used.  This allows me to determine

7 at what level of substance a dog is reliable, and whether the dog is being properly maintained such that

8 he/she will not respond to materials that, through poor maintenance, it may come to associate with drugs.

9       14.  Laboratory analysis and field test results on all substances found as result of the dog's

10 response in other cases.  This allows me to determine if the dog is alerting on substances that it is actually

11 trained to detect.

12       I swear that, to the best of my knowledge and memory, the foregoing is true and correct.

13

14 Dated: 4 MAR 2002

      DR. DAN J. CRAIG, DVM, MS
15       DECLARANT

16

17

18

19

20

21

22

23

24

25

26

27

28 N:\MOTN\cedano.ndd.dec

3

00CR3357

CURRICULUM VITAE

DAN J. CRAIG, BS, DVM, MS

CONSULTANT IN ANIMAL BEHAVIOR

916 Country Meadow

San Antonio, Texas 78253-5304

210-679-7804

EDUCATION: BS, Animal Science. Texas A & M 1956

DVM Texas A & M 1958

MS. Experimental Psychology. Baylor University 1970

PROFESSIONAL ORGANIZATIONS:

American Veterinary Medical Association

The American Veterinary Society of Animal Behavior

Texas Veterinary Medical Association

The Veterinary Medical Association of Bexar County

PREVIOUS POSITIONS:

1990 to present

Consultant in Animal Behavior

1974-1990

Chief, Animal Behavior Section

3280 Technical Training Group

USAF Security Police Academy

Lackland AFB. Texas

Developed and statistically analyzed training protocols to train dogs to perform military tasks ( drug detection, explosives detection and controlled aggression), conducted applied behavioral research, developed and validated dog procurement evaluation procedures, provided behavioral consultation service for military veterinarians. Developed and validated training protocols to teach dog to detect other target odors for other federal agencies ( FBI, U S Secret Service, Federal Aviation Administration, US Department of Agriculture). Wrote the principles of conditioning which were incorporated in all the dog training course outlines to teach military working dogs, instructors, and handlers to properly train their dogs to perform all required tasks. Provided technical guidance to the upgrade of the Educational Subject Block Index C1 to C15 used in the field maintenance of military working dogs and handlers by the USAF. Established objective certification standards for patrol dogs, drug detector dogs, and explosives detector dogs. Developed a validation system to determine the reliability of detector dogs that became the standard for the USAF in Air Force Regulation AFR 125-5, Military Working Dog Program. Developed and justified the establishment of a consignment process in order to predict a very high rate of trainability of dogs entering the military procurement system. Developed and justified an Interactive Video Disc System to be used in initial dog instructor and handler training and for advanced upgrade training after assignment of handlers to field units. Wrote the post-certification evaluation standards ( validation testing AFR 125-5 par 11-28) that were incorporated in the Military Working Dog Program Regulation. Supervised personnel who performed independent evaluations of all the dogs trained by the Department of Defense to determine if they met certification standards. Conducted training seminars for instructors, kennel masters, and training non-commissioned officers who were attending the MWD Supervisors Course.

1974 Jan to Oct
Research Veterinarian
Wilford Hall, USAF Medical  Center
Lackland AFB, Texas

Developed a system to identify appropriate aggressive responses by dogs to predict trainability. Provided behavioral consultation service to other military veterinarians relating