KAREN P. HEWITT
United States Attorney
REBECCA S. KANTER
Assistant U.S. Attorney
California State Bar No. 230257
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Phone: (619) 557-6747
Fax: (619) 235-6747
E-mail: rebecca.kanter@usdoj.gov


Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08cr2268-LAB |
| Plaintiff, | ) ) ) | **RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS:** |
| v. | ) ) | |
| FERNANDO RODRIGUEZ-MENDOZA, | ) ) ) ) ) ) ) ) | **(1) SUPPRESS EVIDENCE DUE TO FOURTH AMENDMENT VIOLATIONS (2) SUPPRESS STATEMENTS/CONDUCT A VOLUNTARINESS HEARING (3) DISMISS THE INDICTMENT FOR APPRENDI VIOLATION; (4) TO PRESERVE EVIDENCE (5) TO COMPEL DISCOVERY** |
| Defendant. | ) ) ) ) | Date:   August 25, 2008 Time:   2:00 p.m. Court:  The Hon.  Larry A. Burns |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, United States Attorney, Karen P. Hewitt, and Assistant U.S. Attorney Rebecca S. Kanter, and hereby files its Response and Opposition to Defendant's Motions to Suppress Evidence, Suppress Statements, Dismiss the Indictment, Preserve Evidence, and Compel Discovery.  This Response and Opposition is based upon the files and records of this case, together with the attached Statement of Facts, Memorandum of Points and Authorities, as well as the Government's Motion for Reciprocal Discovery.

/ /

# I

## STATEMENT OF FACTS

**A.      Primary Inspection**

On June 29, 2008, at approximately 2:30 p.m., Fernando Rodriguez-Mendoza ("Defendant") drove a white Ford F-250 bearing Arizona license plate number AAV746 ("the truck") to the United States Border Patrol Highway 86 Checkpoint ("the Checkpoint.") Defendant was approached by Border Patrol Agent Scott Marino, who asked Defendant of what country he was a citizen. Defendant said he was a citizen of Mexico and a legally admitted permanent resident. Agent Marino asked to see his resident card, and Defendant presented an I-551 card. Agent Marino noticed that Defendant's hands were shaking as he handed over his card.

Meanwhile, as Agent Marino was interviewing Defendant about his immigration status and reviewing his card, Agent Raymond Vega conducted a canine sniff of the vehicle. The canine, Hoby, alerted to the truck bed, which contained a large storage toolbox and an auxiliary fuel tank. Agent Vega requested Agent Marino to send the vehicle to secondary inspection. After completing the immigration interview, Agent Marino directed Defendant to secondary inspection.

**B.      Secondary Inspection**

In secondary inspection, Agent Vega approached Defendant and asked if he would consent to a search of his vehicle. Defendant said "yes." Agent Vega asked Defendant to turn off the engine and exit the vehicle. Agent Vega conducted a second canine search, and Hoby alerted to the auxiliary fuel tank mounted in the bed of the truck. Agents Vega and Marino searched the fuel tank area where the canine alerted. They noticed that the two bolts that mounted the tank to the truck bed appeared to have been tampered with. Agent Marino searched the inside of the tank with a fiber optic scope and noticed that the tank was modified to contain separate compartments. Agents Marino and Vega turned the tank on its side to reveal several large cellophane wrapped bundles. They tested the green-leafy substance contained in the bundles, which tested positive for marijuana. Defendant was escorted into the checkpoint for further investigation.

The total weight of the nine bundles removed from the fuel tank was 85.32 kilograms (188.1 pounds).

## C.     Post-Miranda Interview

At approximately 7:58 p.m., Border Patrol Agent Veronica Lozano read Defendant his Miranda rights in Spanish.  Defendant acknowledged that he understood his rights and agreed to answer the questions of Drug Enforcement Agent Tracy Huxman and Bureau of Land Management Special Agent Craig Moore without the presence of an attorney.

Defendant said that on June 24, 2008, five days before he was arrested, he had a fight with his wife in Mexico.  He said he didn't return to the United States until June 29, 2008, between 11 a.m. and noon.  Defendant said he was alone in his truck when he crossed back in to the United States.  Defendant said that he then went to his house in Yuma, Arizona at approximately 1 p.m.  He said that he then drove directly to the Checkponit and did not stop after leaving his house at 148 North 21st Avenue in Yuma.  He said he was traveling to an apartment complex call the Palms in Indio, California to met his friend Jose.  Defendant was unable to provide Jose's last name. He also said he was going to look for a job because he hadn't worked for two months.

Defendant claimed he bought the truck from a man named Mike in Yuma, Arizona two months prior.  He said the car lot was located on 32nd Avenue and 4th Street in Yuma, Arizona.  He said he paid $5,000 for the truck.  He said he paid for the truck with money loaned to him by his friend Pedro.  Defendant did not know Pedro's last name.  He said that when he purchased the vehicle, the auxiliary fuel tank was mounted in the bed of the truck.  He denied knowledge of the marijuana in the tank.  Defendant claimed to own both of the two cellular phones found in his car, but was unable to provide agents with the telephone number.  The interview ended at 8:17 p.m.

## II

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

### A.     The Highway 86 Checkpoint Is Validly Used Primarily For Immigration Enforcement

Defendant argues that all evidence should be suppressed in this case because the Highway 86 checkpoint is impermissibly used for general law enforcement purposes.  (Def.'s Mot. at 2.)  The legality of internal Border Patrol Checkpoints, however, is well-settled at this point.  See e.g., Martinez-Fuerte, 428 U.S. 543 (upholding San Clemente, California and Sarita, Texas Border Patrol checkpoints); Soto-Camacho, 58 F.3d 408 (upholding validity of Jacumba, California Border Patrol checkpoint);

1  United States v. Vasquez-Guerrero, 554 F.2d 917 (9th Cir. 1977) (upholding validity of checkpoint near

2  Oak Grove, California); United States v. Baca, 368 F.Supp. 398 (S.D. Cal. 1973) (upholding several

3  Border Patrol checkpoints within the Southern District of California, including the Highway 86

4  checkpoint).    In Baca, Judge Turrentine analyzed each of the Border Patrol's internal checkpoints

5  within the Southern District of California, *including the Highway 86 Checkpoint involved in this case.*

6  Baca, 368 F.Supp. at 417.  In upholding the validity of the checkpoint,[1] Judge Turrentine found that the

7  checkpoint was located in an area just 36 miles from the United States/Mexico international boundary

8  in an uninhabited area of the desert.  Id.  The court found that although the checkpoint was located at

9  a point on Highway 86 with one of the lowest volumes of traffic, "over half of the vehicles reaching this

10  checkpoint have come directly from Mexicali, B.C., Mexico."  Therefore, Judge Turrentine concluded

11  that the checkpoint posed "little intrusion and inconvenience to innocent travelers."  Id.

12    Three years after Baca, the Supreme Court adopted much of Judge Turrentine's reasoning in

13  Martinez-Fuerte when it held that vehicle stops and brief questioning at internal checkpoints were

14  consistent with the Fourth Amendment.  428 U.S. at 563.  The Supreme Court held that the Border

15  Patrol could stop and refer vehicles to secondary inspection even in the absence of any individualized

16  or reasonable suspicion.  Id. at 562.

17    Finally, Defendant further claims that the checkpoint operates as a general crime-control

18  checkpoint, which is prohibited by City of Indianapolis v. Edmond, 531 U.S. 32 (2000).  (Def.'s Mot.

19  at 3.)  However, Edmond stated made clear that its holding "does nothing to alter the constitutional

20  status of the . . . border checkpoints that we approved of in . . . Martinez-Fuerte."  531 U.S. at 47.

21  Although drug interdiction cannot be the primary purpose of a checkpoint, id., "[i]llegal drug

22  interdiction may be carried out at immigration checkpoints though not the primary purpose of those

23  checkpoints."  United States v. Ventura, 447 F.3d 375, 378 (5th Cir. 2006).  "The primary purpose of

24

25

26    [1]    Baca actually determined that the checkpoints at issue were the "functional equivalents"
of the border, and thus permissible.  See e.g., Baca, 368 F.Supp. at 417.  The "functional equivalent"

27  justification for checkpoints was later repudiated, however.  See e.g., United States v. Franzenberg, 739
F.Supp. 1414, 1422 (S.D.Cal. 1990) (finding the San Clemente Checkpoint not to be the functional

28  equivalent of the border).  Nonetheless, neither Baca nor any other "functional equivalent" cases were
ever overturned because the reasoning of the decisions remained sound, as evidenced by the Supreme
Court's reliance on Baca in Martinez-Fuerte.

4

1   a traffic checkpoint operation is to apprehend aliens and smugglers who have managed to evade

2   apprehension at the border and are attempting to travel to interior locations." United States v. Gabriel,

3   405 F.Supp.2d 50 (D.Me. 2005) (internal quotations omitted).  In challenging the reasonableness of a

4   Border Patrol checkpoint, a defendant must overcome the presumption of regularity that attaches to

5   discretionary agency decision making.  See United States v. Payne, 905 F.2d 1376, 1378 (10th Cir.

6   1990).

7       The Highway 86 Checkpoint continues to operate primarily as an immigration checkpoint.

8   Indeed, it continues to be operated by the Border Patrol, not the Drug Enforcement Administration or

9   some other agency whose mission is not immigration-centered.  Defendant has failed to rebut this

10  presumption of regularity.  Accordingly, Edmond is inapposite to the present case.

11  **B.    Defendant Was Permissibly Referred To Secondary For A Reasonable Period**

12      Defendant argues at various points in his motion that there was no legal basis for the agents'

13  referral to secondary inspection.  (See, e.g., Def.'s Mot. at 4-5,6.)  The law is well settled that Border

14  Patrol agents may stop every vehicle passing an operational internal checkpoint, even in the absence of

15  individualized suspicion.  United States v. Martinez-Fuerte, 428 U.S. 543, 562 (1976).  Nor do agents

16  need any individualized reasonable suspicion in order to refer a vehicle from primary to secondary for

17  further immigration inspection.  Id.; United States v. Soto-Camacho, 58 F.3d 408 (9th Cir. 1995).  In

18  fact, any *potential* immigration violation supports a referral to secondary.  United States v. Preciado-

19  Robles, 964 F.2d 882 (9th Cir. 1992).  Although the Ninth Circuit has yet to decide whether something

20  more is required for purely non-immigration referrals, other courts have held that agents generally must

21  have "reasonable suspicion" that criminal activity is afoot.  See generally, United States v. Ellis, 330

22  F.3d 677 (5th Cir. 2003) (requiring individualized suspicion for non-immigration related referrals).

23      In the first instance, no suspicion was required because the agents were not able to rule out the

24  existence of an immigration violation at the time Defendant was referred to secondary inspection.  Agent

25  Marino noticed Defendant's hands trembling as he handed over his I-551 card.  In Soto-Camacho, the

26  Ninth Circuit held that referral to secondary was justified even though the Border Patrol agents were

27  uncertain as to the reason for the observed nervous behavior of the defendant.  58 F.3d at 412.

28  Accordingly, agents did not need individualized suspicion to refer Defendant to secondary.

1    While the Government does not concede that reasonable suspicion was required, the uncontested

2    circumstances of the events indicate that agents had the reasonable suspicion to refer Defendant to

3    secondary.  Reasonable suspicion is simply "a particularized and objective basis for suspecting the

4    person stopped of criminal activity."  United States v. Ornelas, 517 U.S. 690, 696 (1996).  In forming

5    reasonable suspicion, the officer is entitled to draw upon personal experience and specialized training

6    and to make inferences from, and deductions about, the cumulative information available to him that

7    "might well elude the untrained person."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  "The

8    process does not deal with hard certainties, but with probabilities" and "commonsense conclusions about

9    human behavior."  United States v. Cortez, 449 U.S. 411, 418 (1981).  The standard amounts to more

10   than a "hunch" and less than probable cause.  Arvizu, 534 U.S. at 274.

11   Here, Defendant entered the Highway 86 Checkpoint as the driver and sole occupant of a truck

12   bearing Arizona license plates.  Upon initial questioning, Agent Marino noticed Defendant's hands

13   began to tremble.  In addition, as Defendant was answering Agent Marino's questions, Agent Vega's

14   canine Hoby alerted to the bed of the truck.  The bed contained an auxiliary fuel tank as well as a large

15   storage box.  Based on the totality of circumstances, including their training and experiences as Border

16   Patrol agents, the agents had reasonable suspicion to refer Defendant to secondary.  See United States

17   v. Crapser, 472 F.3d 1141, 1148 (9th Cir. 2007); Cortez, 449 U.S. at 418 (stating that in making a

18   reasonable suspicion determination, the evidence "must be seen and weighed not in terms of library

19   analysis by scholars, but as understood by those versed in the field of law enforcement").

20   **C.    Defendant Voluntarily Consented To The Search Of His Vehicle**

21   Defendant next contends that he did not consent to the search of his vehicle and therefore, the

22   fruits of that search should be suppressed.  (Def.'s Mem. P. & A. at 5.)  Because Defendant did consent

23   to the search of his vehicle, the motion to suppress should be denied.  United States v. Preciado-Robles,

24   964 F.2d 882, 885 (9th Cir. 1992).

25   During primary or secondary inspection of a vehicle at an immigration checkpoint, Border Patrol

26   agents may request consent to search.  United States v. Martinez-Fuerte, 428 U.S. 543, 567 (1976);

27   United States v. Morales, 972 F.2d 1007 (9th Cir. 1992), cert. denied, 507 U.S. 1012 (1993).  Where

28   agents obtain voluntary consent, they may search without a warrant and even without probable cause.

6

1  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).

2      Here, Defendant voluntarily consented to the search of his vehicle.  Consent need not be

3  knowing or intelligent, but must be voluntary, that is, it must not be the product of coercive police

4  behavior that overbears the will of the individual.  See United States v. Watson, 423 U.S. 411, 424

5  (1976).  The Ninth Circuit has developed a "totality of circumstances" standard to determine whether

6  consent is voluntary. Specifically, there are five *non-exclusive* factors relevant to this inquiry: (1)

7  whether the defendant is in custody; (2) whether the arresting officers had their guns drawn; (3) whether

8  Miranda warnings were given;[2] (4) whether the defendant was told he had the right not to consent; and

9  (5) whether the defendant was told that a search warrant could be obtained.  United States v. Cormier,

10  220 F.3d 1103, 1112 (9th Cir. 2000).  "The fact that some of these factors are not established does not

11  automatically mean that consent was not voluntary." United States v. Castillo, 866 F.2d 1071, 1082 (9th

12  Cir. 1988).

13      Several weigh in favor of concluding that Defendant voluntarily consented to the search of his

14  trunk.  First, Defendant was not in custody at the time he gave consent.  United States v. Leasure, 122

15  F.3d 837, 840 (9th Cir. 1997) ("In most cases, the earliest a person could be in custody is at the point

16  when she is moved into a secondary inspection area and asked to exit her vehicle while it is searched.")

17  In the present case, Defendant was not asked to exit the vehicle until **after** he had already given consent

18  to search the car.  See Def. Exh. A at 3.   Therefore, as in Leasure, Defendant was not in custody at the

19  time he gave his consent.

20      Defendant contends in his declaration that he was not asked for consent to search the truck until

21  after he was taken into the office at the checkpoint.  Even accepting Defendant's version of the fact, i.e.

22  even if he was already in the security office, those circumstances do not necessarily support a finding

23  that Defendant was in custody.  Custody involves the deprivation of "freedom of action in any

24  significant way."  Miranda v. Arizona, 384 U.S. 437, 444 (1966).  The Defendant bears the burden of

25  proving that he was in custody.  United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984). As

26

27      [2]    After the Cormier decision, the Ninth Circuit cast doubt on the relevance of Miranda
warnings, concluding that it is at best an "open to question . . . whether the inclusion or exclusion of
28  Miranda warnings in a givens set of circumstances should weigh much in either direction in considering
voluntariness."  United States v. Perez-Lopez, 348 F.3d 839, 847 (9th Cir. 2003).

7

evidenced by the probable cause statement in this case, Defendant was merely subjected to a brief investigatory stop at the point in time he was asked for his consent. See Terry v. Ohio, 392 U.S. 1, 20 (1968).  The stop was akin to a routine traffic stop, which is not a "custodial" situation despite the obvious limitations it puts on the drivers and passengers freedom of action. See U.S. v. Berkemer, 468 U.S. 420, 441 (1984) (acknowledging that a traffic stop necessarily curtails a driver's freedom of action, but the coerciveness of the stop is limited by its brief and public nature.) The stop in this case was merely a border stop made in the presence of multiple officers and three other suspects. See United States v. Galindo-Gallegos, 244 F.3d 728, 730-32 (9th Cir. 2001) (no custody during border stop because questioning occurred in public with 2 officers and 15-20 suspects), amended by 255 F.3d 1154 (9th Cir. 2001).

The fact that Defendant in his declaration claims he did not feel free to leave is of no instance. The Supreme Court has instructed trial courts "to look to the objective circumstances" rather than "the subjective view harbored by either the suspect or the interrogating officers to determine whether the defendant is in custody." United States v. Leasure, 122 F.3d 837, 840 (9th Cir. 1997), quoting Stansbury v. California, 511 U.S. 318, 324 (1994).  "The case books are full of scenarios in which a person is detained by law enforcement  officers, is not free to go, but is not 'in custody' for Miranda purposes." United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001).  For example, "a brief detention at the border by immigration and customs officials of persons presenting themselves for admission to the United States is not [in] custody, even though such persons are not free to leave. . ." Id.  As in Leasure, although Defendant was not free to go when he was asked for consent to search his car, "neither was [he] jailed, handcuffed, or subjected to anything besides inconvenience or delay." Butler, 249 F.3d at 1099; see also United States v. RRA-A, 229 F.3d 737 (9th Cir. 2000) (finding that juvenile was arrested not when she was taken to an office and frisked, but only when she was handcuffed to a bench in the locked security office.)

Second, the arresting officers did not have their guns drawn.  There is nothing to suggest that they did beyond the statement in Defendant's moving papers that "Mr. Rodriguez was ordered to secondary by an armed, uniformed officer, and was made to wait there while other armed, uniformed officers searched other cars." (Def.'s Mot. at 5.) Notably, Defendant does not indicate (in his moving

papers, let alone in his declaration) that the weapons were ever drawn. Such an equivocal, unsworn statement should not have any bearing on the Court's analysis. The simple fact that the agents were armed and in uniform simply means they were on duty and acting in the scope of their duties as Border Patrol agents at the time of their interactions with Defendant. There is nothing to suggest in the existing files and records to suggest they did or would have had any reason to draw their weapons. Nor did the agents threaten Defendant in any way.

Third, the agents did not <u>Mirandize</u> Defendant before he gave consent because he was not under arrest. Therefore it has no bearing on the voluntariness determination. Accordingly, the Court should find that Defendant's consent was voluntary.

**D.    <u>Agents Lawfully Referred Defendant From Primary To Secondary Inspection</u>**

Finally, Defendant contends that if the Government seeks to rely on the dog alert to support "probable cause,"[3] it must provide to Defendant discovery regarding the reliability of the dog. (Def.'s Mot. at 6.)    In <u>Cedano-Arellano</u>, the Ninth Circuit, without citing any authority, held that the training records and certification relating to a drug detector dog were discoverable for pretrial suppression motions under Rule 16. 332 F.3d at 571. However, this is only an issue of the weight of the evidence if doubt is cast on the reliability of the canine. Contrary to Defendant's broad request for all documents related to the canine, the Ninth Circuit in <u>Cedano</u> did not require that all canine documents be produced. The Court limited the holding to "the dog's training records and certification records. . . nothing more." <u>United States v. Nava</u>, 363 F.3d 942, 944 n.1 (9th Cir. 2004). The United States Attorney's Office has requested the training records and certification from the United State Border Patrol and is awaiting said records related to Hoby in order to provide them in discovery.

**III**

_____

[3]    As articulated in Section II.B, supra, "probable cause" to refer Defendant to secondary is not required. <u>U.S. v. Martinez-Fuerte</u>, 428 U.S. 543, 556 (1976). In order to refer someone from primary to secondary at an internal Border Patrol checkpoint for a *non*-immigration related violation, the agents must have an objective "individualized suspicion of wrongdoing." <u>United States v. Ellis</u>, 330 F.3d 677 (5th Cir. 2003). The Supreme Court has held that reasonable suspicion includes "a *particularized* and *objective* basis for suspecting the person stopped of criminal activity." <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996) (emphasis added). Thus, agents at an internal checkpoint must merely be able to articulate *particularized* and *objective* facts that serve as the basis for an individual's non-immigration related referral primary to secondary.

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant moves to suppress the statements his client made after being read and waiving his constitutional rights per Miranda.  Specifically, Defendant alleges that "[h]e was confronted by large, armed agents. . . and forced into a small room, with his back against the wall" which he found "overwhelming and nerve-wracking."  (Def. Mem. P. & A. at 7.)  The United States contends that Defendant's waiver and his statements were knowing and voluntary, and he has failed to raise factual dispute that is relevant to finding that his waiver and his statements were involuntary.

**A.    Standards Governing Admissibility of Statements**

A statement made in response to custodial interrogation is admissible under Miranda v. Arizona, 384 U.S. 437 (1966) and 18 U.S.C. § 3501, if a preponderance of the evidence indicates that the statement was made after an advisement of rights, and was not elicited by improper coercion. *See* Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda rights should be found in the "absence of police overreaching").  Although the totality of circumstances, including characteristics of the defendant and details of the interview, should be considered, improper coercive activity must occur for suppression of any statement.  *See* id. (noting that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); *cf.* Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("Some of the factors taken into account have included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations omitted).

**B.    Standards Governing Grant or Denial of Evidentiary Hearing**

Under Ninth Circuit and Southern District precedent, as well as Southern District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to suppress only when the defendant adduces specific facts sufficient to require the granting of the defendant's motion. *See* United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) (where "defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer, . . . . the district court was not required to hold an evidentiary hearing"); United States v. Moran-Garcia, 783 F. Supp. 1266, 1274

1   (S.D. Cal. 1991) (boilerplate motion containing indefinite and unsworn allegations was insufficient to

2   require evidentiary hearing on defendant's motion to suppress statements); Crim. L.R. 47.1.  The local

3   rule further provides that "the Court need not grant an evidentiary hearing where either party fails to

4   properly support its motion for opposition."

5   **C.**    **Adequate Proof to Support Rejection of a Motion to Suppress**

6        The Ninth Circuit has expressly stated that a proffer by the United States  based on the statement

7   of facts attached to the complaint is alone adequate to defeat a motion to suppress where the defense

8   fails to adduce specific and material facts.  *See* Batiste, 868 F.2d at 1092.  Even if Defendant provides

9   factual allegations, the Court may still deny an evidentiary hearing if the grounds for suppression consist

10  solely of conclusory allegations of illegality.  See United States v. Wilson, 7 F.3d 828, 834-35 (9th Cir.

11  1993) (District Court Judge Gordon Thompson did not abuse his discretion in denying a request for an

12  evidentiary hearing where the appellant's declaration and points and authorities submitted in support

13  of motion to suppress indicated no contested issues of fact).

14  **D.**    **Defendant's Statements Should Not Be Suppressed**

15       In this case, even assuming Defendant's version of the facts of his post-arrest statement are true

16  – even if he was, in fact, in a small room with "large, armed agents" who did not all speak Spanish –

17  his waiver and his statements were nonetheless legally voluntary considering the factors in

18  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  ("Some of the factors taken into account have

19  included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice

20  to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of

21  the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations

22  omitted).

23       First, Defendant is not a youth – he is a 32 year old legal permanent resident of the United States.

24  Second, although he claims he "does not speak English," the documents found in his vehicle evidencing

25  his purchase of the F-250 and signed by Defendant were all in English, suggesting at least a passing

26  education and literacy in English to conduct a vehicle purchase transaction.  His lack of English skills,

27  however, is besides the point, as his interview and even the questioning pertaining to his demographic

28  information was done with the translation assistance of Border Patrol Agents Efrain Gonzalez and

11

1  Veronica Lozano in the Spanish language.  (Def. Exh. C at 5.)

2  There is no indication that Defendant was subjected to any physical punishment such as the

3  deprivation of food or sleep.  And although Defendant observes that the agents were "large" and

4  "armed," he does not indicate that they actually brandished their weapons or threatened him in any way.

5  Moreover, the interview only lasted from 7:58 p.m. to 8:17 p.m, less than 20 minutes.  (Def. Exh. C. At

6  5, 7.)  Therefore, the length of the detention was short and the interview was not prolonged. Based on

7  an analysis of these factors, even assuming the Defendant's version of his interview was true, the

8  evidence before this Court is that his statements were knowing and voluntary and he knowingly and

9  voluntarily waived his right to remain silent or consult an attorney.

10  **E.    The Vienna Convention Does Not Require Suppression of Defendant's Statements**

11  Defendant argues that the "Border Patrol agents violated the Vienna Convention, and therefore,

12  the any [sic] statements that occurred after this violation should be suppressed."  (Def. Mem. P. & A.

13  at 8.)  As Defendant himself recognizes, United States v. Lombera-Camorlina, 206 F.3d 882 (9th Cir.

14  2000) explicitly forecloses this argument.  In Lombera, the Ninth Circuit held that even "assuming that

15  some judicial remedies are available for the violation of Article 36, the exclusion in a criminal

16  prosecution of evidence obtained as the result of post-arrest interrogation is not among them."  Id. at

17  887.  Defendant's motion to suppress statements on this ground should be denied.

18  **IV**

19  **DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

20  Defendant moves to dismiss the indictment "based on the unconstitutionality of §§ 21 U.S.C.

21  841 and 960."  (Def. Mem. P. & A. at 9.)  This argument is foreclosed by the Ninth Circuit's decision

22  in United States v. Buckland, 289 F. 3d 558 (9th Cir. 2002) and United States v. Mendoza-Paz, 286 F.

23  3d 1104 (9th Cir. 2002). Defendant's motion to dismiss the indictment on this ground should be denied.

24  **V**

25  **DEFENDANT'S MOTION TO PRESERVE EVIDENCE**

26  The undersigned AUSA sent a letter on July 16, 2008, to the Assistant Special Agent in Charge

27  and Special Agent in Charge, Drug Enforcement Administration, requesting that the narcotics and

28  vehicle, including the auxiliary fuel tank, be preserved until the conclusion of the case.  The United

States will continue to endeavor to preserve the physical evidence in order to comply with any future court orders.  Moreover, the United States has complied with Defendant's request to view the physical evidence and coordinated his access to the evidence.

The United States objects, however, to the request that all such evidence be preserved through the pendency of any appeals.  Once Defendant has had the opportunity to inspect, photograph, and otherwise access all evidence prior to trial, it is unnecessary for evidence to be preserved beyond the conclusion of trial in this case, in particular the bulk marijuana and the vehicle.

## VI

## DEFENDANT'S MOTIONS TO COMPEL DISCOVERY

The Government produced and Defendant picked up 34 pages of discovery on July 18, 2008, including the reports from the Border Patrol agents and Drug Enforcement Administration agents, an inventory of Defendant's property, copies of the documents found in his possession and in the vehicle, and photographs of the vehicle and the narcotics.  On August 11, 2008, the Government produced 52 additional pages of discovery consisting of supplemental investigative reports, additional copies of documents pertaining to Defendant's purchase of the vehicle, and, at Defendant's request, color copies of the photographs previously produced in discovery.  Finally, on August 12, 2008, the Government produced a CD containing audio recordings of Defendant's MCC phone calls as well as a log related to those calls.

The Government recognizes its obligation, under Rules 16(a)(1)(A) and 16(a)(1)(B), to provide to Defendant the substance of Defendant's oral statements and written statements.  (Unless otherwise noted, all references to "Rules" refers to the Federal Rules of Criminal Procedure.)  The Government has produced all of the Defendant's statements that are known to the undersigned Assistant U.S. Attorney at this date.  If the Government discovers additional oral or written statements that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be promptly provided. The Government has provided Defendant with all known reports related to Defendant's arrest in this case and will continue to produce reports generated as the investigation continues.  The Government will continue to comply with its obligation to provide to Defendant all reports subject to Rule 16(a)(1)(A).   The Government has no objection to the preservation of the agents' handwritten notes.

1  See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original

2  notes of interviews of an accused or prospective government witnesses).  However, the Government

3  objects to providing Defendant with a copy of the rough notes at this time.  The Government is not

4  required to produce the notes pursuant to the Jencks Act because the notes do not constitute

5  "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a substantially

6  verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the witness.  United

7  States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980).  The notes are not Brady material because, as

8  discussed further, the notes do not present any material exculpatory information or any evidence

9  favorable to Defendant that is material to guilt or punishment.  If, during a future evidentiary hearing,

10  certain rough notes become particularly relevant, the notes in question will be made available to

11  Defendant.

12  **(1)    Brady Material**

13         The Government will perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) to disclose

14  material exculpatory information or evidence favorable to Defendant when such evidence is material

15  to guilt or punishment.   The Government recognizes that its obligation under Brady covers not only

16  exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on behalf

17  of the United States.  See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bagley,

18  473 U.S. 667, 676-77 (1985).  This obligation also extends to evidence that was not requested by the

19  defense.  Bagley, 473 U.S.  at 682; United States v. Agurs, 427 U.S. 97, 107-10 (1976).  "Evidence is

20  material, and must be disclosed (pursuant to Brady), 'if there is a reasonable probability that, had the

21  evidence been disclosed to the defense, the result of the proceeding would have been different.'"

22  Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (en banc).  The final determination of materiality

23  is based on the "suppressed evidence considered collectively, not item by item."  Kyles v. Whitley, 514

24  U.S. 419, 436-37 (1995).

25         Brady does not, however, mandate that the Government open all of its files for discovery.  See

26  United States v. Henke, 222 F.3d 633, 642-44 (9th Cir. 2000) (per curiam).  Under Brady, the United

27  States is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence (see United

28  States v. Smith, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the defendant from other

14

sources (see United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995)); (3) evidence that the defendant already possesses (see United States v. Mikaelian, 168 F.3d 380-389-90 (9th Cir. 1999) amended by 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the undersigned Assistant U.S. Attorney could not reasonably be imputed to have knowledge or control over.   See United States v. Hanson, 262 F.3d 1217, 1234-35 (11th Cir. 2001).   Brady does not require the Government "to create exculpatory evidence that does not exist," United States v. Sukumolahan, 610 F.2d 685, 687 (9th Cir. 1980), but only requires that it "supply a defendant with exculpatory information of which it is aware." United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976).

**(2)    Any Proposed 404(b) Evidence**

The Government will disclose in advance of trial the general nature of any "other bad acts" or "other acts" evidence that the United States intends to introduce at trial pursuant to Fed. R. Evid. 404(b). Evidence should not be treated as "other bad acts" evidence under Fed. R. Evid. 404(b) when the evidence concerning the other bad acts and the evidence concerning the crime charged are "inextricably intertwined."  United States v. Soliman, 812 F.2d 277, 279 (9th Cir. 1987).

**(3)    Evidence Seized**

The Government has prepared and will produce copies of documents seized at the time of Defendant's arrest.  The Government has made arrangements for Defendant's counsel to view and inspect the evidence on August 20, 2008.  The Government will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the Government as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant.

Defendant specifically requests the opportunity to inspect a 1993 Honda Odyssey and 50.34 kilograms of marijuana.  Defendant was driving a Ford F-250 with 85.32 kilograms of marijuana.  There is no Honda Odyssey or seizure of 50.34 kilograms of marijuana for Defendant to inspect.

**(4)    Request for Preservation of Evidence**

The Constitution requires the Government to preserve evidence "that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984).  To

require preservation by the Government, such evidence must (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489; see also Cooper v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001).

As indicated in § V, *supra*, the Government has made every effort to preserve evidence it deems to be relevant and material to this case, including sending a letter to the agency in charge requesting the specific preservation of evidence. Any failure to gather and preserve evidence, however, would not violate due process absent bad faith by the Government that results in actual prejudice to the Defendant. See Illinois v. Fisher, 540 U.S.1174, 124 S.Ct. 1200 (2004) (per curiam); Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); United States v. Rivera-Relle, 322 F.3d 670 (9th Cir. 2003); Downs v. Hoyt, 232 F.3d 1031, 1037-38 (9th Cir. 2000).

**(5)    Tangible Objects**

The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy documents and tangible objects that are within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the Government as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant. The Government need not, however, produce rebuttal evidence in advance of trial. United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984).

**(6)    Expert Witness**

The Government will provide notice prior to trial of any expert witnesses that will be called to testify at trial.

**(7)    Evidence of Bias or Motive to Lie**

The Government recognizes its obligation under Brady and Giglio to provide evidence that could be used to impeach Government witnesses including material information regarding demonstrable bias or motive to lie. The Government is not aware of any evidence of any bias or motivation to lie on the part of prospective government witnesses. If the Government discovers the existence of information related to a government witness's bias or motive to lie, the information will be provided to the

16

1  Defendant.

2  **(8)**      **Impeachment Evidence**

3      As discussed elsewhere, the Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to

4  provide material evidence that could be used to impeach Government witnesses.

5  //

6  //

7  **(9)**      **Evidence of Criminal Investigation of Any Government Witness**

8      Defendant is not entitled to any evidence that a prospective witness is under criminal

9  investigation by federal, state, or local authorities.  The Government is under no obligation to turn over

10  the criminal records or rap sheet of its potential witnesses.  <u>United States v. Taylor</u>, 542 F.2d 1023, 1026

11  (8th Cir. 1976).  The Government will, however, provide the conviction record, if any, which could be

12  used to impeach witnesses the United States intends to call in its case-in-chief.

13  **(10)**     **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth-Telling**

14      The Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide material evidence

15  that could be used to impeach Government witnesses including material information related to

16  perception, recollection, ability to communicate, or truth telling.  The Government strenuously objects

17  to providing any evidence that a witness has ever used narcotics or other controlled substance, or has

18  ever been an alcoholic because such information  is not discoverable under Rule 16, <u>Brady</u>, <u>Giglio</u>,

19  <u>Henthorn</u>, or any other Constitutional or statutory disclosure provision.

20  **(11)**     **Witness Addresses**

21      The Government has provided Defendant with the reports containing the names, work locations,

22  and telephone numbers of the agents involved in this case.  The Government will provide additional

23  contact information prior to the motion hearing in this case.  In its trial memorandum, the Government

24  will provide Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although

25  delivery of such a witness list is not required.  <u>See</u> <u>United States v. Discher</u>, 960 F.2d 870 (9th Cir.

26  1992); <u>United States v. Mills</u>, 810 F.2d 907, 910 (9th Cir. 1987).  The Government strenuously objects

27  to providing the home addresses or the home or personal cellular telephone numbers to Defendant.  In

28  non-capital cases, the Government is not even required to disclose the names of its witnesses prior to

17

trial. <u>United States v. Dishner</u>, 974 F.2d 1502, 1522 (9th Cir 1992); (<u>citing</u> <u>United States v. Steel</u>, 759 F.2d 706, 709 (9th Cir. 1985)); <u>United States v. Hicks</u>, 103 F.23d 837, 841 (9th Cir. 1996); <u>see</u> <u>also</u> <u>United States v. Bejasa</u>, 904 F.2d 137 (2d Cir. 1990) (holding that United States did not improperly deny defendant access to government witnesses whose telephone numbers and addresses the government refused to provide because defendant knew the identities of the government witnesses and presumably knew their telephone numbers or could have contacted them through the exercise of due diligence).

**(12)     Name of Witnesses Favorable to the Defendant**

The Government is not aware of the names of any witnesses favorable to the Defendant's case. If the Government discovers any witnesses favorable to Defendant, the names of such witnesses will be promptly provided.

**(13)     Statements Relevant to the Defense**

The Government will provide all statements relevant to Defendant as required by Rule 16, <u>Brady</u>, and <u>Jencks</u>.    The Government is not all possible information and evidence regarding any speculative defense claimed by Defendant. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995) (<u>per</u> <u>curiam</u>) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under <u>Brady</u>).

**(14)     Jencks Act Material**

Rule 26.2 incorporates the Jencks Act, 18 U.S.C. §3500, into the Federal Rules of Criminal Procedure. The Jencks Act requires that, after a Government witness has testified on direct examination, the Government must give the Defendant any "statement" (as defined by the Jencks Act) in the Government's possession that was made by the witness relating to the subject matter to which the witness testified. 18 U.S.C. §3500(b).  For purposes of the Jencks Act, a "statement" is (1) a written statement made by the witness and signed or otherwise adopted or approved by her, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. §3500(e).   If notes are read back to a witness to see whether or not the government agent correctly understood what the witness was saying, that act constitutes "adoption by the witness" for purposes of the Jencks Act. <u>United States v. Boshell</u>, 952 F.2d 1101, 1105 (9th Cir. 1991) (<u>citing</u> <u>Goldberg v. United States</u>, 425 U.S. 94, 98 (1976)).  There is no

1   applicable Jencks material at this time.  If the case proceeds to trial, the Government will produce any

2   materials covered by the Jencks Act relevant to the testifying witness(es).

3

**(15)    Giglio Information**

4   An agreement that the Government makes with a witness for testimony in exchange for money

5   or in exchange for favorable treatment in the criminal justice system is generally subject to disclosure

6   as impeachment evidence under Brady and Giglio.  See United States v. Kojayan, 8 F.3d 1315, 1322-23

7   (9th Cir. 1993); Benn v. Lambert, 238 F.3d 1040, 1054-60 (9th Cir. 2002).   The Government is not

8   aware of any Giglio information related to this case.  If the Government discovers the existence of

9   Giglio information, the information will be provided to the Defendant.

10  **(16)    Report of Scientific Tests or Examinations**

11  At this time, the only scientific test that the Government is aware of is an analysis of the

12  marijuana by the DEA laboratory.  The Government has provided that as page 44 of discovery.  The

13  Government will continue to provide Defendant with the results of any scientific tests or examinations

14  in accordance with Rule 16(a)(1)(F) when those tests results are received.

15  **(17)    Informants and Cooperating Witnesses**

16  At this time, the United States is unaware of any informants or cooperating witnesses related to

17  this case.  If the United States determines that there is a confidential informant whose identity is

18  "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," it

19  will disclose that person's identity to the Court for in-chambers inspection.  See Roviaro v. United

20  States, 353 U.S. 53, 60-61 (1957); United States v. Ramirez-Rangel, 103 F.3d 1501, 1505 (9th Cir.

21  1997).

22  **(18) & (19)    Henthorn Material**

23  The Government will comply with United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and

24  request that all federal agencies involved in the criminal investigation and prosecution review the

25  personnel files of the federal law enforcement inspectors, officers, and special agents whom the

26  Government intends to call at trial and disclose information favorable to the defense that meets the

27  appropriate standard of materiality.  United States v. Booth, 309 F.3d 566, 574 (9th Cir. 2002), citing

28  United States v. Jennings, 960 F.2d 1488, 1489 (9th Cir. 1992).   If the undersigned Assistant U.S.

Attorney is uncertain whether certain incriminating information in the personnel files is "material," the information will be submitted to the Court for an in camera inspection and review.

The United States objects to Defendant's request that the Government attorney personally review the law enforcement personnel files. This request is foreclosed by the Ninth Circuit's ruling in Jennings, in which the Court explicitly rejected such a broad reading of Henthorn and held that the Government attorney does not have the obligation to personally review the files. 960 F.2d at 1492.

**(20)    Training of Relevant Law Enforcement Agencies**

The United States objects to any request for discovery of policies, instructions and training manuals regarding the interrogation of subjects or handling of evidence.

**VI**

**GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY**

**A.    All Evidence That Defendant Intends To Introduce In Her Case-In-Chief**

Since the Government will honor Defendant's request for disclosure under Rule 16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1). Pursuant to Rule 16(b)(1), the Government requests that Defendant permit the Government to inspect, copy and photograph any and all books, papers, documents, photographs, tangible objects, or make copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession and control of Defendant, which she intends to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom Defendant intends to call as a witness. The Government also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the Government receives the reciprocal discovery to which it is entitled.

**B.    Reciprocal Jencks – Statements By Defense Witnesses (Other Than Defendant)**

Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires production of the prior statements of all witnesses, except a statement made by Defendant. The time

frame established by Rule 26.2 requires the statements to be provided to the Government after the witness has testified.  However, to expedite trial proceedings, the Government hereby requests that Defendant be ordered to provide all prior statements of defense witnesses by a reasonable date before trial to be set by the Court.  Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

**VI**

**CONCLUSION**

For the foregoing reasons, the Government requests that the Court deny Defendant's motions, except where unopposed, and grant the Government's motion for reciprocal discovery.

DATED: August 18, 2008.

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

/s/***Rebecca Kanter***
REBECCA S. KANTER
Assistant United States Attorney
Attorneys for Plaintiff
United States of America

1

2

3                          UNITED STATES DISTRICT COURT

4                        SOUTHERN DISTRICT OF CALIFORNIA

5   UNITED STATES OF AMERICA,          )   Criminal Case No. 08cr2268-LAB
                                       )
6                         Plaintiff,   )
                                       )   CERTIFICATE OF SERVICE
7              v.                      )
                                       )
8   FERNANDO RODRIGUEZ-MENDOZA,        )
                                       )
9                         Defendant.   )
                                       )
10  ─────────────────────────────────  )

11  IT IS HEREBY CERTIFIED THAT:

12        I, REBECCA S. KANTER, am a citizen of the United States and am at least eighteen years
13  of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

14        I am not a party to the above-entitled action.  I have caused service of **RESPONSE AND
    OPPOSITION** on the following parties by electronically filing the foregoing with the Clerk of the
15  District Court using its ECF System, which electronically notifies them.

16        Erick Guzman, Federal Defenders of San Diego, Inc.

17        I hereby certify that I have caused to be mailed the foregoing, by the United States Postal
    Service, to the following non-ECF participants on this case:
18
          None
19
    the last known address, at which place there is delivery service of mail from the United States
20  Postal Service.

21        I declare under penalty of perjury that the foregoing is true and correct.

22        Executed on August 18, 2008.

23                                            /s/ *Rebecca Kanter*
                                              REBECCA S. KANTER
24

25

26

27

28